573 F.2d 1082
 98 L.R.R.M. (BNA) 2090, 83 Lab.Cas. P 10,492
 Ann ROBESKY, Plaintiff-Appellant,
v.
QANTAS EMPIRE AIRWAYS LIMITED, Defendant-Appellee,
and
International Association of Machinists and Aerospace
Workers, AFL-CIO, Airline Employees District 141,
Defendant-Appellee.
 Nos. 75-1238 and 75-1406.
 United States Court of Appeals,
Ninth Circuit.
 March 13, 1978.
 
 Ernest C. Moore, III (argued), of Torkildson, Katz & Conahan, Honolulu, Hawaii, for plaintiff-appellant.
 Peter G. Wheelon (argued), of Anthony, Hoddick, Reinwald & O'Connor, Honolulu, Hawaii, for Qantas Empire Airways Limited.
 Sheldon M. Charone (argued), Chicago, Ill., for International Assn. of Machinists and Aerospace Workers, AFL-CIO.
 Appeal from the United States District Court for the District of Hawaii.
 Before BROWNING, TRASK, and KENNEDY, Circuit Judges.
 BROWNING, Circuit Judge:
 
 
 1
 Ann Robesky was discharged from employment as a reservation sales agent by Qantas Empire Airways Limited. She brought this suit under the Railway Labor Act, 45 U.S.C. §§ 152 and 182, charging her former employer with violation of the collective bargaining agreement, and her union, District 141 of the International Association of Machinists and Aerospace Workers, with violation of its duty of fair representation. Judgment was entered for both defendants after trial to the court. Mrs. Robesky appeals.
 
 
 2
 * Appellant claims Qantas breached the collective bargaining agreement (1) by refusing to grant her a leave of absence, and (2) by failing to administer less severe punishment than discharge. We find both claims without merit.
 
 
 3
 1. Appellant was employed by Qantas in April 1964. At first she performed well. Her health and work performance deteriorated, however, because of increasingly severe migraine headaches and the medication she took to relieve them. She was absent from work a substantial portion of the time.[1] When on duty, her speech was sometimes slurred, her writing illegible, and her work marred by mistakes. On March 17, 1969, Qantas informed appellant that her performance was unacceptable and suspended her pending hearing. On March 24, a hearing was held in accordance with the grievance procedure established by the collective bargaining agreement. Appellant was notified on the following day that she was discharged effective March 30. The Union appealed on her behalf, and a hearing was held on April 16. On that day Qantas notified the Union that "(t)he appeal at the third step is denied and Mrs. Robesky's discharge stands, effective March 30."
 
 
 4
 At the April 16 hearing the Union asked that appellant be granted a 90-day leave of absence pursuant to Article 10A of the collective bargaining agreement.[2] Qantas refused. Appellant contends this refusal breached Article 10A. The parties agree that appellant was entitled to a leave of absence under Article 10A if (1) there was "justifiable reason" for leave, (2) the "requirements of the service will permit" leave, and (3) appellant had made a "proper application" for leave.
 
 
 5
 The district court noted that a letter from appellant's doctor presented at the hearing stated "it is difficult to determine the length of illness or date of cure," and Qantas' representatives at the hearing "argued that the requirements of service would not permit granting a leave of absence especially in view of the medical uncertainties as to appellant's condition." The district court concluded that appellant's discharge was not in violation of the collective bargaining agreement.
 
 
 6
 The district court's holding that Article 10A was not violated implies a determination that appellant failed to satisfy at least one of the three preconditions for obtaining leave under Article 10A. The record would support such a determination as to all three preconditions. As to the precondition that "requirements of the service will permit," there was evidence that appellant was one of only two reservation sales agents on a swing shift, and that the nature of the position made it impossible to fill it with a temporary employee. As Qantas argues, ill health would seem to provide a "justifiable reason" for temporary leave under the contract only when there is a reasonable possibility that temporary leave might alleviate the problem and enable the employee to return to work. Qantas' local manager, Mr. King, testified that appellant's request was denied because appellant's doctor could not give him any encouragement that a 90-day period would make any difference in her performance. As Mr. King noted, although an earlier two-week vacation had resulted in some improvement in appellant's work performance, the improvement was short-lived. Finally, it is doubtful that a "proper application" was made on appellant's behalf. Appellant was suspended March 17 and discharged effective March 30. The Union first requested temporary leave for appellant at the April 16 hearing. It is unlikely Article 10 was intended to apply to an employee not only suspended but already discharged.
 
 
 7
 2. Appellant argues that Qantas breached the collective bargaining agreement by discharging her rather than adopting a less extreme course. Admittedly it was Qantas' policy "to move slowly . . . , (to) give the employee every opportunity to correct the error of his ways." Appellant contends that her "abrupt discharge" was contrary to this "established and admitted practice of progressive discipline," and therefore was not for "just cause" within the meaning of the collective bargaining agreement. See Babcock and Wilcox Co., 41 L.A. 862 (1963).
 
 
 8
 The district court concluded that the collective bargaining agreement had not been violated, thus determining that Qantas acted within the limits of its general practice of affording a delinquent employee a reasonable opportunity to achieve acceptable performance before resorting to discharge. The record supports this determination. Appellant's discharge was not "abrupt." On the contrary, the record reflects repeated efforts by Qantas over a period of months to solve the problem short of discharge, including conferences, oral and written warnings and admonitions, suspensions from daily work, and a two-week leave of absence.
 
 
 9
 We therefore sustain the district court's rejection of appellant's direct contract claim against Qantas on its merits.[3] This does not end the matter, however. A less-than-ironclad grievance may be settled. Appellant's grievance was. As will be seen, the manner in which the Union handled the settlement may require that appellant be afforded a remedy against the Union.[4]
 
 II
 
 10
 Appellant contends that in the special circumstances of this case the Union breached its duty to represent her fairly by failing to tell her that her grievance would not be taken to arbitration, leading appellant to reject an offer of settlement she would otherwise have accepted.[5]
 
 
 11
 Appellant first argues that the trial court applied an erroneous legal standard to the evidence. We must agree.
 
 
 12
 The court stated its general finding in these words: "There is no evidence of ill will, prejudice, or deliberate bad faith on the part of the UNION or any of its representatives with ROBESKY, or in the handling of her case." This formulation appears to reflect the standard applied prior to Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967).[6] In that case, however, the standard was restated: "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith" (emphasis added).[7] The addition of arbitrariness to the catalogue of conduct the union is obliged to avoid "reflects a calculated broadening of the fair representation standard," and "a rejection of . . . cases . . . holding that 'a bad faith motive, an intent to hostilely discriminate' is required . . . ." Retana v. Apartment Workers Local 14, 453 F.2d 1018, 1023 n.8 (9th Cir. 1972). Since the district court, as the trier of fact, may have absolved the Union for want of evidence of evil motive without considering whether the Union's conduct was arbitrary, the judgment must be reversed, see Beriault v. ILWU Local 40, 501 F.2d 258, 264 (9th Cir. 1974), unless on the evidence a reasonable person could not have found the Union acted arbitrarily.[8] We turn to the record.
 
 
 13
 Following rejection of appellant's appeal at the third and final step of the grievance procedure, Mrs. Robesky asked William Reick, the Union's vice president for Hawaii, to submit her grievance to arbitration. Reick drafted a proposed submission and sent it to the office of District 141 of the Union in Burlingame, California to be revised, typed, and filed. Richard W. Thomas, General Chairman of District 141, and George Robinson, President and General Manager of District 141, did not file appellant's submission until after the expiration of the time limits specified in the collective bargaining agreement.[9] Either because of this tardy submission or, as the Union contends, because of their low evaluation of the merits of appellant's grievance, Robinson and Thomas decided to settle the grievance short of arbitration. As a result "no arbitrator was selected, or even attempted to be selected."[10] Neither Reick nor Robesky were informed of the tardy submission or of the Union's decision to forgo arbitration. Neither "were aware that the submission to arbitration was languishing. Both thought an arbitrator would take up the case."
 
 
 14
 Robinson and Thomas pressed for settlement of the Robesky grievance. In October of 1969, their efforts proved successful; in return for a Union concession on a separate matter, Qantas agreed to a compromise. Under the compromise, Mrs. Robesky was to be reinstated by Qantas without back pay, without certain seniority rights, and subject to a 90-day probationary period. In exchange for Qantas' agreement to offer appellant reinstatement, the Union withdrew "from any further consideration of the case presently pending before a neutral arbitrator regarding the termination of employment of Mrs. Ann Robesky." On November 4, Qantas drafted a letter to appellant offering reemployment under the conditions agreed upon. The letter did not recite the fact that the Union had withdrawn the pending arbitration. The letter was not mailed immediately, but was discussed with Reick, who in turn discussed it with appellant. By this time Reick had learned that appellant's grievance had been withdrawn from arbitration and knew, therefore, that appellant's only hope for reinstatement lay in accepting Qantas' settlement offer. Nonetheless, if appellant's testimony is believed, Reick did not inform appellant of these facts when he discussed Qantas' offer with her. Appellant, misled by an ignorance Reick and the Union helped to foster and which Reick could easily have dispelled, rejected Qantas' offer. On November 26, Reick informed Qantas that the terms of the offer of reinstatement were not acceptable to appellant. Qantas then mailed the written offer to appellant. On December 8, appellant wrote to Qantas formally rejecting the offer and setting forth the terms on which she would be willing to accept reemployment. Qantas treated appellant's letter as a rejection of the offer and ignored her counteroffer. The Union wrote appellant that the Union would pursue her case no further. Qantas did not give appellant an opportunity to reconsider her request of the offer of reinstatement.
 
 
 15
 The trial court made no finding as to the state of appellant's knowledge at the time she received Qantas' offer of reinstatement. The court said, "It is not clear just what ROBESKY understood about her situation. She appears to have thought she could negotiate with the company as to her reemployment." It is clear, and the court found, that by October 22 appellant was aware that a settlement was in the making and would result in an offer of reemployment. But appellant testified she was not told and did not know that as part of the settlement the Union had withdrawn her grievance from arbitration. She testified that she thought her case could still go to arbitration, and that she would have accepted the company's offer of reemployment had she known it was her only opportunity for reinstatement.
 
 
 16
 Appellant's claim against the Union rests upon her assertion that she did not know that arbitration of her grievance was foreclosed. If on remand the court finds against appellant on this crucial issue of fact, appellant will have no claim.[11]
 
 
 17
 The Union argues that even if appellant did not know the Union had decided that her claim would not go to arbitration or that the Union had later withdrawn her claim from arbitration, the Union's failure to inform her was not arbitrary but at most negligent, and mere negligence is not enough to breach the duty of fair representation owed by a union to its members.
 
 
 18
 Appellant's claim is not so easily disposed of. A trier of fact could conclude under either of two theories that the Union acted arbitrarily. If the Union intentionally withheld from appellant the fact that her grievance would not be arbitrated, the trier of fact could determine that such a course of action had no rational basis and was therefore arbitrary. If the Union withheld the critical information unintentionally, the trier of fact could conclude that the Union's omission was so egregious as to be arbitrary. We examine these alternatives in turn.
 
 1. Lack of Rational Basis
 
 19
 The district court found appellant was kept in ignorance of the Union's determination that her grievance would not be taken to arbitration because of a deliberate decision by Union officials and not through oversight. The court found the Union decided to withhold the information from appellant to avoid the risk that Qantas might learn of the Union's low opinion of the merit of appellant's grievance and be unwilling to settle on acceptable terms.[12]
 
 
 20
 The Union concedes that conduct is "arbitrary" if it is "without rational basis." NLRB v. General Truck Drivers, 545 F.2d 1173, 1176 (9th Cir. 1976).[13] The context indicates that in Vaca the Supreme Court used the term "to describe irrational or unreasoned decisions." Clark, The Duty of Fair Representation: A Theoretical Structure, 51 Tex.L.Rev. 1119, 1131 (1973). "(S)ome circumstances may justify holding that a union's reason was simply too insubstantial to support its action." Id. at 1139.
 
 
 21
 The trier of fact could find the Union's conduct arbitrary in the sense that it was without rational basis.[14] The reason the Union offers for the concealment may have been rational as to Qantas and those who might disclose the information to Qantas, but it hardly justifies misleading the claimant herself. The risk of inadvertent disclosure was minimal. Appellant's employment had been terminated, and with it her opportunity for routine contact with other Qantas employees and supervisory personnel. Appellant's need to know and her incentive to maintain secrecy were both unquestionable. Moreover, only her interests were at stake. If she were prejudiced by her own indiscreet disclosures only she would be injured, and she would have no cause for complaint. Once the settlement had been agreed to and all that remained was for appellant to accept or reject Qantas' offer of reinstatement, appellant's need for the information became critical, and continued concealment was supported by no reason at all.[15]
 
 2. Egregious Unfairness
 
 22
 The Union does not attempt to justify the nondisclosure as deliberate but rational. Instead, the Union ignores the court's finding that the failure to notify appellant was intentional and asserts that if a failure to communicate occurred, it was at most negligent and therefore not a violation of the duty of fair representation. Even accepting the Union's premise that the nondisclosure was unintentional, the Union may have breached its duty to appellant.
 
 
 23
 " Arbitrary" conduct is not limited to intentional conduct. For example, to "ignore a meritorious grievance or process it in a perfunctory fashion" may be arbitrary. Vaca v. Sipes, supra, 386 U.S. at 191, 87 S.Ct. at 917. See also Hines v. Anchor Motor Freight, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). While courts have said negligent conduct is not enough to breach the duty of fair representation, these references are to simple negligence violating the tort standard of due care.[16] Acts of omission by union officials not intended to harm members may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary. See Ruzicka v. General Motors, 523 F.2d 306, 309-10 (6th Cir. 1975); Griffin v. UAW, 469 F.2d 181, 183 (4th Cir. 1972);[17] Clark, supra, 51 Tex.L.Rev. at 1170-71. For example, the First Circuit in DeArroyo v. Sindicato de Trabajadores Packing AFL-CIO, 425 F.2d 281 (1st Cir. 1970), held that the total and inexplicable failure of a union to investigate a series of grievances was arbitrary. In rejecting a union contention that its failure to pursue the grievances reflected a mere error of judgment, the court noted that "(h)ad the Union given anything but the most perfunctory attention to these grievances, it would have been obvious" that they had merit. Id. at 285. The Sixth Circuit in Ruzicka v. General Motors Corp., 523 F.2d 306 (6th Cir. 1975), reached a similar conclusion, finding a union's grossly negligent failure to process a grievance in a timely fashion, to be arbitrary. Such "handling of the grievance", the court said, "unrelated as it was to the merits of appellant's case, amounts to unfair representation. It is a clear example of arbitrary and perfunctory handling of a grievance." Id. at 310.
 
 
 24
 From these cases and others, see Griffin v. UAW, supra, Retana v. Apartment Workers Local, supra, 453 F.2d at 1018, it is clear that unintentional acts or omissions by union officials may be arbitrary if they reflect reckless disregard for the rights of the individual employee, see Retana v. Apartment Workers Local, supra, 453 F.2d at 1024; DeArroyo v. Sindicato de Trabajadores Packing AFL-CIO, supra, 425 F.2d at 285; Ruzicka v. General Motors Corp., supra, 523 F.2d at 310; see also Hines v. Anchor Motor Freight, 424 U.S. 554, 569, 96 S.Ct. 1048, 47 L.Ed.2d 231; Vaca v. Sipes, 386 U.S. 171, 191, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); they severely prejudice the injured employee, see Griffin v. UAW, supra, 469 F.2d at 183; and the policies underlying the duty of fair representation would not be served by shielding the union from liability in the circumstances of the particular case, Ruzicka v. General Motors Corp., supra, 523 F.2d at 310.
 
 
 25
 All three elements may be present in the peculiar circumstances of this case. A trier of fact could reasonably find that the Union acted in reckless disregard of Mrs. Robesky's interests. This is especially evident with regard to the period after the settlement was negotiated. The general terms of the settlement were agreed upon by October 20, 1969, and the formal agreement was signed October 31. On November 4 Qantas discussed the offer of reemployment with Reick, the local Union official in charge of appellant's case. Reick transmitted the offer to appellant and on November 26 informed Qantas that appellant had rejected the offer. Qantas forwarded its written offer directly to appellant on December 2. The offer was rejected by appellant on December 8. On December 13 the Union informed appellant it would proceed no further. If appellant's testimony is accepted, this was the first time she was told her grievance would not go to arbitration an important if not critical fact in determining whether it was in her interest to accept or reject Qantas' offer.
 
 
 26
 The Union officers were fully aware of the situation. It was they who had decided prior to negotiations that appellant's grievance would not be arbitrated. It was they who had agreed to and accomplished the formal withdrawal of the grievance from arbitration as an element of the settlement. The Union officers had ample opportunity to convey the critical information to appellant. Reick was in frequent communication with appellant before and after the negotiations; he was the direct link between appellant and Qantas in connection with her consideration of the offer of reemployment.
 
 
 27
 On this evidence a trier of fact could conclude that the Union's failure to inform appellant that her grievance had been withdrawn from arbitration reflected reckless disregard of appellant's rights.
 
 
 28
 A trier of fact could reasonably conclude that appellant suffered severe prejudice from the Union's failure to disclose; the Union's silence led to appellant's discharge the industrial equivalent of capital punishment. Griffin v. UAW, supra, 469 F.2d at 183. The policies underlying the duty of fair representation would be served by affording appellant a remedy for the grave injury resulting from the egregious conduct of her collective bargaining agent. The countervailing policies which counsel in favor of limiting a union's liability to the members do not argue against affording appellant a remedy in the circumstances of this case. The Union's ability to screen meritless grievances from the arbitration process, Vaca v. Sipes, 386 U.S. 171, 191-92, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) would not have been impaired by disclosure to appellant. The collective strength of the Union and its ability to allocate group resources, Ford Motor Co. v. Huffman, 345 U.S. 330, 337-38, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) would not have been undermined. Telling appellant her grievance had been withdrawn from arbitration would not have impaired the interests of other workers, cost the Union money, or dissipated the Union's bargaining power.
 
 
 29
 In sum, a trier of fact could reasonably find that the Union's failure to disclose to appellant that her grievance would not be submitted to arbitration was without rational basis or was reckless and extremely prejudicial. In the circumstances of this case, either finding would support a conclusion that the Union acted arbitrarily and therefore breached its duty of fair representation.
 
 
 30
 As to Qantas, the judgment is affirmed.[18] As to the Union, the judgment is vacated and the cause remanded for further proceedings.
 
 KENNEDY, Circuit Judge, concurring:
 
 31
 I concur in all that is said in part I of this decision, pertaining to the employee's suit against the employer. I concur also in the order remanding the case against the union for further proceedings, but do not agree with the analysis in part II of the court's opinion.
 
 
 32
 The principles set forth in our decision should be ones that can be followed faithfully by the employee's bargaining agent. The standards imposed here, however, are not clear. I suggest the difficulty stems from use of the term "arbitrary" to define a standard of care, when instead it should describe the standard we apply on reviewing the adequacy of the procedures followed by the union in the processing and resolution of grievances. The court attempts to define the term "arbitrary" by using tort law concepts of culpability. As such the term apparently proscribes conduct not involving bad faith, see Beriault v. Local 40, Super Cargoes and Checkers, 501 F.2d 258 (9th Cir. 1974), but which is more blameworthy than ordinary negligence. Dente v. International Organization of Masters, Mates and Pilots, Local 90, 492 F.2d 10, 12 (9th Cir. 1973), cert. denied, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974). Neither the law of torts nor precedents in the federal common law of labor relations provide adequate guidance to define the term "arbitrary" in this manner.
 
 
 33
 The issue in the case is simply whether the procedures followed in the handling of the grievance were adequate. A labor union has some discretion in determining the proper resolution of an employee grievance. Vaca v. Sipes, 386 U.S. 171, 191-93, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The Supreme Court has required that in exercising this discretion a union should adjust grievances in a manner that is neither arbitrary nor perfunctory. Vaca, supra. The standard of review imposed by this rule seems to me to require the kind of scrutiny we use whenever we review a determination by an individual or body entrusted with discretionary power. We inquire whether the discretion granted has been abused by a failure to make a reasoned decision. In the case now before us, we should inquire whether the union decisions lacked a rational basis, or whether by perfunctorily processing a grievance so that a reasoned decision was not made, the union foredoomed the grievance. In determining whether a union's handling of a grievance is arbitrary or perfunctory, the trial court should consider whether the grievance lacked merit, e. g., Fountain v. Safeway Stores, Inc., 555 F.2d 753, 756 (9th Cir. 1977), as well as the importance of the grievance to the employee. These factors may bear upon whether or not there was a rational basis for the failure to advise the employee of the status of the claim, and whether or not the procedures followed in the particular case were adequate and fair to protect the interests at stake.
 
 
 34
 The record in this case would support a finding that the union followed procedures that were not adequate and therefore I would remand the case for further determination under the standards explained here; but I would not require the district court to scan the union's conduct by placing it upon a tort law based continuum of fault.
 
 
 
 [1]
 Appellant was on sick leave with and without pay a total of 934.25 hours or 116.8 days in about five years of employment: 81.5 hours in 1964; 118.5 hours in 1965; 124.5 hours in 1966; 292 hours in 1967; 204.75 hours in 1968, and 113 hours in the first two and a half months of 1969
 
 
 [2]
 Article 10A of the collective bargaining agreement provides:
 Where a justifiable reason exists and where the requirements of the service will permit, an employee covered by this Agreement will, upon proper application to the Company, be granted a leave of absence in writing for a period not in excess of ninety (90) days, and the local designated representative of the Union will be notified of all such leaves granted. Such leave or leaves may be extended for additional periods not to exceed ninety (90) days upon appropriate application in writing to the Company and Union and approval in writing. An employee granted leave of absence shall retain and continue to accrue seniority during the first ninety (90) days of any such leave of absence. For leave of absence in excess of ninety (90) days, the employee shall retain but shall not accrue seniority after ninety (90) days, except where the leave has been granted because of health, injury or special assignment by the Company. Special assignment leaves in the interest of the Company may be extended without approval from the Union.
 
 
 [3]
 The Union purported to appeal from this and several other findings, contending that they were clearly erroneous. The appeal will be dismissed. Partmar Corp. v. Paramount Pictures Theatres Corp., 347 U.S. 89, 99 n.6, 74 S.Ct. 414, 98 L.Ed. 532 (1954); Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 176, 54 S.Ct. 658, 78 L.Ed. 1182 (1934); New York Tel. Co. v. Maltbie, 291 U.S. 645, 54 S.Ct. 443, 78 L.Ed. 1041 (1934); Cochran v. M & M Transp. Co., 110 F.2d 519, 522 (1st Cir. 1940)
 
 
 [4]
 Since appellant's claim does not depend on the validity of her grievance, the strength or weakness of the grievance is irrelevant. See Minnis v. UAW, 531 F.2d 850, 854 (8th Cir. 1975). It is therefore unnecessary for appellant to establish both a valid grievance and a breach of the duty of fair representation as an employee must when he has suffered no damage unless the grievance was meritorious. See Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 570-71, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976)
 
 
 [5]
 The Union intimates that appellant is raising for the first time on appeal the issue that the Union's failure to disclose constituted a breach of the duty of fair representation. The issue was raised by appellant in two hearings on motions for summary judgment prior to trial. It was among the issues listed in appellant's trial brief. Lack of notification was the only issue to which appellant testified at trial
 
 
 [6]
 See Duggan v. International Ass'n of Machinists, 510 F.2d 1086, 1088 (9th Cir. 1975); Beriault v. ILWU Local 40, 501 F.2d 258, 263 (9th Cir. 1974); Retana v. Apartment Workers Local 14, 453 F.2d 1018, 1023 n.8 (9th Cir. 1972)
 
 
 [7]
 The doctrine of fair representation originated in cases decided under the Railway Labor Act, 45 U.S.C. § 151 et seq., which applies here. Although Vaca arose under the National Labor Relations Act, 29 U.S.C. § 151 et seq., it "furnish(es) guidance." Duggan v. International Ass'n of Machinists, 510 F.2d 1086, 1087-88 (9th Cir. 1975). The principles underlying the doctrine are the same in both contexts
 
 
 [8]
 See 28 U.S.C. § 2111; O'Brien v. Thall, 283 F.2d 741, 743 (2d Cir. 1960)
 
 
 [9]
 The submission was not filed within the period provided by the collective bargaining agreement due to "negligence on the part of the UNION," according to the district court. The Union challenges this finding, see note 3 supra, but its accuracy is not critical to our holding
 
 
 [10]
 This and subsequent quotations are from the trial court's findings
 
 
 [11]
 The Union contends the evidence established appellant knew or should have known her grievance was not to be arbitrated. However, the evidence as to her knowledge is in conflict, and the trial court made no finding that would support the Union's thesis, directly or indirectly
 As noted earlier in the text, appellant testified unequivocally that she was not told and did not know that her grievance would not be arbitrated.
 Both Thomas and Robinson testified they informed Reick that appellant's grievance would not be arbitrated, but they also testified they did not inform appellant. Only Reick spoke with appellant. Reick's testimony as to whether he had informed appellant was weak:
 Q. As soon as Thomas told you that the union had decided not to arbitrate the grievance, did you tell that to Ann?
 A. I think I did. I think so.
 Q. Did you call her up and tell her?
 A. I don't remember that. I don't know. It's not something that you would run to the phone
 The Union relies upon the district court's finding that on October 22 appellant was informed by Reick that a settlement was in the making and would result in a letter from Qantas offering her reemployment. The Union argues that "settlement" connotes a final resolution of the dispute, and appellant therefore must have know her grievance would not be arbitrated. The inference is not a necessary one. It would have been reasonable for appellant to believe she could reject the settlement and force the matter to arbitration.
 The Union also argues that a letter written to the Union by appellant on October 30 reflects her awareness of the Union's decision not to arbitrate. This letter expresses appellant's dissatisfaction with Qantas' treatment of her case and requests that her grievance be submitted to arbitration. Since appellant had submitted a request for arbitration months earlier, the Union argues that the only rational explanation for this letter is that appellant already knew arbitration was no longer a possibility. The opposite inference is possible. It may be inferred from the letter that appellant did not know arbitration was foreclosed and wished to reassert her desire to have her grievance arbitrated. Appellant testified that this was in fact her state of mind.
 
 
 [12]
 The court found as follows:
 Robinson and Thomas did not reveal their strategy in the handling of her case to ROBESKY. They admit deciding rather early in the proceedings that they would not press for arbitration. They explain their silence as necessary to keep the Company off base on the theory that if the Company thought that the UNION thought that this was a bad case to arbitrate, the Company would be unwilling to settle on acceptable terms.
 The finding was based upon the following colloquy between the court and counsel for the Union at a hearing on motion for summary judgment:
 (COUNSEL): All that Mrs. Robesky has to go for her when she was asked the question what facts did she have, she said she was led to believe that the union was going to arbitrate the case and the union was going to pick an arbitrator, and that's true. Not only was she led to believe that but the company was led to believe that. The union had made up its mind that this case should not go to arbitration but they never told Mrs. Robesky and they never told Qantas. They insisted all the time before Qantas that this case was one that was going to go to arbitration and I suppose that may be analogized to a trial lawyer in a personal injury case that, after filing the complaint, he is talking about picking a jury, all the time knowing that he is not going to pick a jury, but he is attempting to get the best settlement he could get.
 In this case, the union did the same thing. They kept that threat of arbitration before Qantas. They said we're going to go ahead and they talked about the selection of an arbitrator, and all the time they were pressing Qantas for a settlement to get her back to work again. They did get her back to work again.
 It was Mrs. Robesky who had refused the offer to go back to work.
 THE COURT: Do you have any explanation as to why the union did not advise Mrs. Robesky of the strategy?
 (COUNSEL): Yes, sir. I think an explanation of that is it's very difficult to keep secrets on anything. If you tell the grievant you're really not going to go to arbitration and she tells a fellow worker and it gets back to the company, it just takes your strategy. It just shoots it down, you know. It's much the same, I think, in the analogy of the personal injury case. Many times a plaintiff's lawyer will be pushing for a jury and they're picking a jury. He knows in his own mind but he doesn't even want to tell his own client.
 The union just felt that if that information was out and Qantas found out about it that they've just lost their bargaining power. To make it a little more difficult, too, the union's main offices are in Burlingame, California. They are not here. Mr. Robinson didn't personally know Mrs. Robesky. Mr. Thomas didn't personally know Mrs. Robesky. That's the explanation that I can give for it. It wasn't intended to mislead Mrs. Robesky. I think at all times the union was actively and militantly seeking to have her go back to work. It wasn't that she was being let out some back door and they were deliberately trying to mislead her. I think the union believed that that was the best possible method to obtain the most effective settlement. I suppose that's the same reason the union never told Mrs. Robesky that they were thinking of giving up claim to the V.I.P. ground hostesses. Again, if you do those things and that comes out, that takes the bargaining lever that you may have.
 I don't think the mere fact that Mrs. Robesky wasn't told is any proof that the union was acting in a bad faith or was arbitrary or discriminatory.
 
 
 [13]
 See also Griffin v. UAW, 469 F.2d 181, 183 (4th Cir. 1972); DeArroyo v. Sindicato de Trabajadores Packing, 425 F.2d 281, 284 n.4 (1st Cir. 1970)
 
 
 [14]
 The Union relies upon the trial court's finding that the settlement "had a rational basis and was a fair compromise under the circumstances." This finding is not relevant to appellant's claim. Appellant does not challenge the reasonableness of the settlement but the irrationality of the Union's failure to inform appellant that the Union had decided not to submit her grievance to arbitration and had agreed to withdraw her grievance from arbitration as part of the settlement agreement. The district court made no finding that this Union omission had a rational basis
 
 
 [15]
 The finding of the district court is equivocal in one respect. Although the court found the Union acted deliberately in order to conceal its low opinion of the merits of the grievance during negotiations for a settlement, there is no specific indication in the finding that the Union intentionally withheld the fact that appellant's grievance had been withdrawn from arbitration after the negotiations. Under one reasonable reading of the record, the failure to inform appellant may have been intentional prior to the settlement with Qantas and unintentional after the agreement was reached. Even under this interpretation, however, the Union could be found in breach of its duty of fair representation. Appellant's injury resulted from the fact that she did not know arbitration of her case was foreclosed. Even if the Union intentionally withheld this information from her only prior to the settlement, her lack of knowledge after settlement could be attributed to this prior arbitrary conduct by the Union
 
 
 [16]
 See, e. g., Minnis v. UAW, 531 F.2d 850, 854 (8th Cir. 1975); Dente v. Masters Local 90, 492 F.2d 10, 12 n.3 (9th Cir. 1973); Brough v. United Steelworkers, 437 F.2d 748, 750 (1st Cir. 1971); DeArroyo v. Sindicato de Trabajadores Packing, 425 F.2d 281, 284 (1st Cir. 1970)
 Other decisions cited for the proposition that negligence is not enough, e. g., Whitten v. Anchor Motor Freight, Inc., 521 F.2d 1335 (6th Cir. 1975), and Cannon v. Consolidated Freightways Corp., 524 F.2d 290 (7th Cir. 1975) appear to retain the requirement of ill will rejected in this circuit. Compare note 5 supra and accompanying text.
 
 
 [17]
 The courts have recognized that some circumstances may impose an obligation upon the union to provide members with particular information. In administering a union security clause, for example, the union must "inform the employee of his rights and obligations so that the employee may take all necessary steps to protect his job." International Union of Elec. Workers v. NLRB, 113 U.S.App.D.C. 342, 346, 307 F.2d 679, 683 (1962). See also Brady v. TWA, 401 F.2d 87, 99 (3d Cir. 1968); NLRB v. Hotel Employees Local 568, 320 F.2d 254, 258 (3d Cir. 1963). In a variety of situations nondisclosure resulting in substantial prejudice to an employee, particularly the loss of employment, has been a significant factor in holding that the duty of fair representation has been breached. See Minnis v. UAW, 531 F.2d 850, 854 (8th Cir. 1975); Harrison v. United Transp. Union, 530 F.2d 558, 562 (4th Cir. 1975); Ruzicka v. General Motors Corp., 523 F.2d 306, 310 (6th Cir. 1975); Day v. UAW Local 36, 466 F.2d 83, 98 (6th Cir. 1972). See also Retana v. Apartment Workers Local 14, 453 F.2d 1018, 1024 n.10 (9th Cir. 1972). Whitten v. Anchor Motor Freight, Inc., 521 F.2d 1335 (6th Cir. 1975), cited to the contrary, apparently requires a showing of "ill will." See note 14 supra. In Bazarte v. United Transp. Union, 429 F.2d 868, 872 (3d Cir. 1970), the employee made "no showing that (the nondisclosure) prejudiced him in any way."
 
 
 [18]
 Appellant has not argued any basis for imposing liability upon Qantas other than that rejected in part I. Cf. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); Humphrey v. Moore, 375 U.S. 335, 356, 84 S.Ct. 363, 11 L.Ed.2d 370 (Goldberg, J., concurring)