656 F.2d 1245
 110 L.R.R.M. (BNA) 3146, 92 Lab.Cas. P 12,968
 D. E. BAKER, et al., Plaintiffs-Appellants,
v.
AMSTED INDUSTRIES, INCORPORATED, a corporation, and United
Steelworkers of America, Defendants-Appellees.
D. E. BAKER, et al., Plaintiffs-Appellees,
v.
AMSTED INDUSTRIES, INCORPORATED, a corporation, Defendant-Appellant.
 Nos. 80-2654, 80-2760.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 14, 1981.
Decided Aug. 21, 1981.
As Modified on Denial of Rehearing and Rehearing En Banc
Denied Dec. 2, 1981.
 
 Timothy W. Woods, South Bend, Ind., for plaintiffs.
 Lawrence L. Summers, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendants.
 Before SPRECHER, Circuit Judge, NICHOLS,* Judge, and CUDAHY, Circuit Judge.
 CUDAHY, Circuit Judge.
 
 
 1
 The issue on this appeal is whether the district court erred in ruling as a matter of law that the United Steelworkers of America ("Union") did not breach its duty of fair representation in failing to pursue to arbitration with Amsted Industries, Inc. ("Amsted") the question of Amsted's pension funding obligations under a collective bargaining agreement with the Union. We affirm, except as to that portion of the district court's order dismissing the complaint against Amsted without prejudice.
 
 I.
 
 2
 Plaintiffs were employed by Amsted at its South Bend Lathe Division ("South Bend Lathe") when, on July 3, 1975, Amsted sold that division to South Bend Lathe, Inc. ("SBL, Inc.").[1] While employed by Amsted, plaintiffs were represented for collective bargaining purposes by the Union. On October 7, 1974, the Union and South Bend Lathe entered into a three-year collective bargaining agreement that was to be effective from October 7, 1974, through October 6, 1977. Article 14 of this agreement provided for various employee pension and insurance benefits, incorporating by reference a revised pension and insurance plan.
 
 
 3
 Upon assuming ownership and control of South Bend Lathe, SBL, Inc., agreed to continue the employment of the four plaintiffs and all other Union-represented employees. SBL, Inc., continued to recognize the Union as the exclusive bargaining agent of the employees, and agreed to comply with most of the terms of the October 7, 1974, agreement. SBL, Inc., declined, however, to be obligated by the provisions of Article 14 of the agreement. On June 27, 1975, the president of SBL, Inc., notified the Union that Amsted had agreed to honor its obligations under the pension plan for services by employees prior to the date of sale, but that SBL, Inc., would provide retirement benefits for service after that date through an employee stock ownership plan.[2]
 
 
 4
 From early April 1975, through the spring of 1976, the Union conducted extensive negotiations with Amsted and SBL, Inc., concerning the impact of the impending sale on, inter alia, pension and insurance benefits, seniority rights and vacation pay.[3]
 
 
 5
 In the spring of 1976, these negotiations ended without an agreement being reached concerning, inter alia, pension funding obligations for services performed after the date of sale. The Union therefore made a written demand that the pension funding question (together with other contract interpretation disputes) be submitted to binding tripartite arbitration. SBL, Inc., and Amsted both rejected this proposal. Therefore, on April 30, 1976, the Union instituted an action in the United States District Court for the Northern District of Indiana (the "Hammond litigation") to compel tripartite arbitration. On October 1, 1976, in an order without opinion, the district court in the Hammond litigation granted Amsted's motion for summary judgment, "provided, however, that plaintiff is hereby granted leave to reinstitute proceedings against defendant Amsted Industries, Incorporated, in the event that said defendant fails to arbitrate bilaterally with (the Union)."[4]
 
 
 6
 After the October 1, 1976, order, although plaintiffs made several inquiries concerning the progress of arbitration between Amsted and the Union, the Union failed to pursue the pension dispute to arbitration with Amsted.[5] Therefore, on March 27, 1980, plaintiffs filed this action against Amsted and the Union, seeking to have their rights declared as to future pension and insurance benefits.
 
 
 7
 On October 22, 1980, the district court entered an order granting summary judgment for both defendants. The bases for that order, as set forth by the district court in an accompanying memorandum, were the undisputed facts (1) that the Union had diligently negotiated with Amsted concerning the pension and insurance rights of the former South Bend Lathe employees, (2) that the Union had attempted to obtain an agreement from Amsted and SBL, Inc., to submit the pension and insurance dispute to tripartite arbitration, (3) that the Union had sued both employers in the Hammond litigation, and (4) that the claims against Amsted and SBL, Inc., were substantially identical, thereby justifying the Union's decision to await the termination of the litigation against SBL, Inc., before proceeding further against Amsted. On such facts, the district court concluded that the Union had not breached its duty of fair representation.[6]
 
 II.
 
 8
 Section 9(a) of the National Labor Relations Act declares that a union designated by the majority of employees in an appropriate unit "shall be the exclusive representative of all employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U.S.C. § 159(a) (1976). Even employees who may have preferred a different representative, or none at all, are bound by the choice of a majority of their fellow workers. Case v. NLRB, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). An agreement between an employer and an individual employee concerning the terms and conditions of employment is ineffective both as a bar to collective bargaining, Case v. NLRB, supra, and as a waiver of benefits under an existing collective bargaining agreement. Order of R. R. Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788 (1944). Thus, terms and conditions of employment can be arranged only by the majority representative, and the rules written into the collective bargaining agreement become the law of the plant for all employees. And federal law allows a collective bargaining agreement to vest the union with exclusive authority to enforce the contractual rights of all employees in the bargaining unit. See 29 U.S.C. § 159(a) (1970); Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). In these respects, "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents ...." Steele v. Louisville & N. R. R., 323 U.S. 192, 202, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944).
 
 
 9
 It early became apparent that majority representatives in the sphere of industrial relations were no less capable of misusing their considerable authority than their counterparts in the political arena. Therefore, in rough analogy to the limits imposed on legislative power by the equal protection clause of the Constitution, the courts have imposed on majority representatives a responsibility equal in scope to their authority, "the responsibility and duty of fair representation." Hines v. Anchor Motor Freight, 424 U.S. 554, 564, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976) (citation omitted).[7] While this duty of fair representation was originally conceived in the context of racial discrimination,[8] it has been applied to reach all union conduct toward a member of a collective bargaining unit that is "arbitrary, discriminatory, or in bad faith." Clayton v. Automobile Workers, --- U.S. ----, ---- N.24, 101 s.CT. 2088, 2098 n.24, 68 l.ED.2d 538 (1981); Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916-17, 17 L.Ed.2d 842 (1967). See, e. g., Robesky v. Qantas Empire Airways, Ltd., 573 F.2d 1082 (9th Cir. 1978) (where an employee rejected employer's settlement offer believing that her grievance would be arbitrated, failure of union to inform employee that her grievance had been withdrawn from arbitration might constitute breach of duty).
 
 
 10
 Although the fair representation doctrine has been a part of our jurisprudence for nearly four decades,[9] its scope has not been easily susceptible of precise delineation. See Morgan, Fair is Foul and Foul is Fair, Ruzicka and the Duty of Fair Representation in the Circuit Courts, U. of Toledo L.Rev. 335 (1980); Note, Determining Standards for a Union's Duty of Fair Representation: The Case for Ordinary Negligence, 65 Cornell L.Rev. 634 (1980). Like any judicially-created doctrine of broad purpose, it must evolve gradually in response to the circumstances of individual cases. But the delineation of the doctrine is made especially difficult by the diverse and divergent interests it must seek to accommodate. Where, as in this case, a union has negotiated a collective bargaining agreement that clothes it with exclusive authority to process employees' grievances against the employer, the union bears a heavy responsibility for processing such claims fairly and conscientiously, since individual employees (including those who opposed representation by their statutorily-imposed agent) are barred from individually seeking redress from their employer's wrongful conduct. See Hines, 424 U.S. at 562-63, 571, 96 S.Ct. at 1055-56, 1059. This weighty interest of the individual employee must be balanced, however, against the potentially conflicting interests of other employees and of the group as a whole. "The collective bargaining system as encouraged by Congress and administered by the NLRB of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit." Vaca, 386 U.S. at 182, 87 S.Ct. at 912.
 
 
 11
 The duty to represent all employees fairly and effectively necessarily requires that the Union have substantial discretion in deciding whether and in what manner a particular grievance should be pursued. While the duty of fair representation must stand firmly as a "bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law," Vaca, 386 U.S. at 182, 87 S.Ct. at 912, it must not operate to vitiate the strengths inherent in collective action. Thus, in deciding whether and to what extent a particular grievance should be pursued, the Union must be allowed the discretion to balance many considerations and interests, including the effect of various resolutions of the grievance on other employees, the requirements of group organization and coherence, the desire for consistent treatment of similar claims, the appropriate allocation of limited resources for pursuing both individual and group claims, the maintenance of the Union's bargaining power and the necessity of maintaining an effective continuing relationship with the employer. See Vaca, 386 U.S. at 182, 87 S.Ct. at 912; Humphrey, 375 U.S. at 341, 349-50, 84 S.Ct. at 367, 371-72; Cox, Rights Under a Labor Agreement, 69 Harv.L.Rev. 601 (1956); Note, Duty of Fair Representation: A Theoretical Structure, 51 Tex.L.Rev. 1119 (1973). In addition, the fair representation doctrine must be limited to avoid inappropriate interference with the National Labor Relations Board's exclusive jurisdiction over unfair labor practices. Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971).[10]
 
 
 12
 There are yet other interests to be considered because, in an employee's § 301 action against his employer, proof of breach of the union's duty can operate to reactivate a grievance otherwise barred by the collective bargaining agreement or reopen an otherwise final and binding arbitration award. The integrity of such private settlement procedures, which are central to our system of industrial relations, might be undermined if the fair representation doctrine is too broadly or freely applied in § 301 actions against employers. Thus, in response to this concern, the Court in Hines stated that proof of breach of duty by the union "involves more than demonstrating mere errors in judgment." 424 U.S. at 570-71, 96 S.Ct. at 1059-60; See also United Parcel Service, Inc. v. Mitchell, --- U.S. ----, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981).[11]
 
 
 13
 The task of properly balancing these interests is further complicated because the relative weight that each interest should be assigned may vary according to the union functions implicated by the employee's particular claim. Thus, it may be appropriate to allow a union greater deference in negotiating a collective bargaining agreement, Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953),[12] than in performing largely ministerial functions of contract administration. See Robesky v. Qantas, supra; Ruzicka v. General Motors Corp., 523 F.2d 306 (6th Cir. 1976) (union failed to file papers in a grievance proceeding in a timely manner); Summers, The Individual Employee's Rights Under the Collective Agreement: What Constitutes Fair Representation, 126 U.Pa.L.Rev. 251 (1977). And, it may also be that the strength of an employee's finality interest will vary according to the time and resources committed by the employer to settlement of the particular grievance through the procedures set forth in the collective bargaining agreement. See note 11, supra.
 
 
 14
 It is entirely possible that the courts are unequal to the task of striking the proper balance between these many interests and their infinite permutations and combinations. But the very complexity of this task also suggests the difficulty of stating a single rule that will provide an appropriate standard of decision in every case. We believe it is preferable instead to consider each claim in light of the interests it implicates in deciding whether the challenged union conduct was "arbitrary, discriminatory or in bad faith." Vaca, 386 U.S. at 190, 87 S.Ct. at 916.
 
 III.
 
 15
 Plaintiffs maintain here that the Union breached its duty of fair representation by failing to arbitrate the pension dispute with Amsted. But that dispute concerns the question whether Amsted may be obligated to make contributions to the pension fund for work performed after the sale of South Bend Lathe to SBL, Inc. (or possibly to provide that the buyer make such contributions). And the Union is continuing to pursue a similar claim for contributions from SBL, Inc., in the Hammond litigation. If the Union were to prevail against SBL, Inc., in that litigation (and the subsequent arbitration), then SBL, Inc., would presumably be obligated by the pension funding provisions of the 1974 contract and plaintiffs will not have suffered any injury as a result of the Union's failure to arbitrate with Amsted.
 
 
 16
 There is no suggestion in this case of particularized discrimination against or hostility toward the plaintiff employees. Moreover, the decision challenged in this case obviously implicates substantial interests of the Union in its capacity as representative of the entire bargaining unit. Even if the Union's litigation strategy were subsequently determined to be misconceived, it would be excessively intrusive into Union decision-making for the courts to decide, in the absence of bad faith or egregious conduct, whether the Union has pursued the tactics most appropriate to the aggrieved employees' needs. See Hines, 424 U.S. at 554, 96 S.Ct. at 1048 (breach of duty involves "more than demonstrating mere errors in judgment"); Baldini v. United Automobile Workers, 581 F.2d 145, 151 (7th Cir. 1978); Ruzicka, 523 F.2d at 316 (McCree, J., concurring).
 
 
 17
 The district court therefore properly determined that the Union did not breach its duty of fair representation by failing to pursue the pension funding claim to arbitration with Amsted.
 
 IV.
 
 18
 Having found that the Union did not breach its duty of fair representation, the district court properly granted defendants' motions for summary judgment. In its October 22, 1980, order granting summary judgment, however, the district court improperly included the caveat that "Plaintiffs' complaint is dismissed without prejudice to the extent that Plaintiffs may reinstitute proceedings against the Defendant (Amsted) after the termination of the Hammond litigation." Since the Union has not breached its duty of fair representation, plaintiffs' Sec. 301 claim against Amsted was properly dismissed, because an employee may not prevail on a § 301 claim against his employer unless he carries the burden of demonstrating breach of duty by the Union. Hines, 424 U.S. at 570-71, 96 S.Ct. at 1059-60; Melendy v. United States Postal Service, 589 F.2d 256, 258-60 (7th Cir. 1978). If the Union in some manner breaches its duty at some future time, plaintiffs would then have a cause of action against the Union (and possibly against Amsted), but such future breach is not an appropriate basis for reinstituting the particular claim that we have decided today was properly dismissed by the district court.
 
 
 19
 As to plaintiffs' ERISA claim, however, we affirm the district court's dismissal without prejudice to the extent that plaintiffs may reinstitute proceedings against Amsted after the termination of the Hammond litigation. As plaintiffs pointed out at oral argument, the Supreme Court's recent decision in Barrentine v. Arkansas-Best Freight Systems, Inc., 450 U.S. 728 101 S.Ct. 1437 [67 L.Ed.2d 641] (1981), may cast doubt on the assumption, previously shared by all parties in this case, that a showing of a breach of the Union's duty of fair representation is a prerequisite to suit under ERISA as well as under Sec. 301. Because the ERISA issue was not adequately briefed or argued before this court, we express no opinion as to the merits of plaintiffs' ERISA claim. We note, however, that the district court's apparent assumption that plaintiffs must exhaust their contractual remedies before instituting suit under ERISA seems well supported in the case law. See e.g., Challenger v. Local Union No. 1 of International Bridge, Structural, and Ornamental Ironworkers, 619 F.2d 645 (7th Cir. 1980); Haeberle v. Board of Trustees, 624 F.2d 1132, 1134 n. 3 (2d Cir. 1980); Amato v. Bernard, 618 F.2d 559, 566-68 (9th Cir. 1980).
 
 
 20
 Accordingly, those portions of the district court's opinion granting defendants' motions for summary judgment against the Union and dismissing plaintiffs' ERISA claims without prejudice are affirmed. Those aspects of the district court's order granting summary judgment and dismissing plaintiffs' Sec. 301 claim against Amsted without prejudice to the extent that the Plaintiffs may reinstitute proceedings against Amsted after the termination of the Hammond litigation are vacated and remanded, with instructions to dismiss the Sec. 301 claim with prejudice in all respects.
 
 
 
 *
 The Honorable Philip Nichols, Jr., Judge of the United States Court of Claims, is sitting by designation
 
 
 [1]
 SBL, Inc., had been known as LWE, Inc., before it acquired South Bend Lathe
 
 
 [2]
 In its June 27, 1975 letter, SBL, Inc., apparently also agreed to continue the insurance plan for active employees, such as the four plaintiffs, and to provide insurance coverage for those employees who would retire from SBL, Inc., after the date of the sale
 
 
 [3]
 Although Amsted and the Union were unable to resolve their differences completely, it was understood that Amsted would make contributions to the pension fund for service rendered by bargaining unit employees prior to the July 3, 1975, sale date. In addition, Amsted agreed to administer the pension plan and to pay retirement benefits both to employees who retired prior to July 3, 1975, and to those employees who were eligible to retire as of that date, even if they continued their employment with SBL, Inc. Therefore, the only dispute that appears to remain concerns Amsted's pension funding obligations for services performed after the date of sale
 
 
 [4]
 In 1977, the Union and SBL, Inc., each filed motions for summary judgment in the Hammond litigation and supported their respective motions with briefs, affidavits and documentary evidence. The district court denied both of those motions based on its finding that there were disputed issues of material fact. The Hammond litigation is still pending before the district court
 
 
 [5]
 After the instant action was threatened, the Union demanded that Amsted bilaterally arbitrate the pension dispute. On April 2, 1980, Amsted refused to arbitrate
 
 
 [6]
 The district court's order also provided that "because the Hammond litigation involving the new employer prevents the employees from bringing a new action against Amsted, the statute of limitations applicable to the employees' claim against Amsted continues to be tolled until the Hammond litigation terminates."
 
 
 [7]
 In Steele, the Court concluded that the bargaining representative has "at least as exacting a duty to represent equally the interests of the members of the craft (i. e., the unit) as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates." 323 U.S. at 202, 65 S.Ct. at 232. The Court emphatically stated that the duties of a bargaining representative extended to all employees in a unit, and that the representative must represent the employees' interests "fairly and impartially." Id. at 204, 65 S.Ct. at 233
 
 
 [8]
 In Steele, the Court held that the designated bargaining representative, which excluded black employees from its membership, violated the duty of fair representation by negotiating a seniority agreement that had the purpose and effect of placing black employees at the bottom of the seniority list
 
 
 [9]
 First recognized with respect to the railroad industry in Steele, the duty of fair representation has been applied to bargaining representatives in all industries reached by the National Labor Relations Act since Syres v. Oil Workers, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1955)
 
 
 [10]
 The Board and the courts exercise concurrent jurisdiction over fair representation claims. See Miranda Fuel Co., 140 N.L.R.B. 181 (1962), enforcement denied, 326 F.2d 172 (2d Cir. 1963) (union's breach of its statutory duty of fair representation violates N.L.R.A. § 8(b), as amended). In Vaca, the Court emphasized that the Board's "tardy" assumption of jurisdiction over fair representation cases does not support the assumption that "Congress, when it enacted § 8(b) in 1947, intended to oust the courts of their traditional jurisdiction to curb arbitrary conduct by the individual employee's statutory representative." 386 U.S. at 183, 87 S.Ct. at 913. Thus, the decision whether a particular claim should be recognized as being within the exclusive competence of the Board "must depend upon the nature of the particular interest being asserted and the effect upon the administration of national labor policies of concurrent judicial and administrative remedies." Id. at 180, 87 S.Ct. at 911
 While claims that primarily concern the proper interpretation and application of internal union regulations raise sensitive labor relations questions that are properly within the exclusive domain of the Board's expertise, Lockridge, 403 U.S. at 291-301, 91 S.Ct. at 1920-25, claims that arise primarily out of the judicially-developed duty of fair representation do not implicate "the need to avoid conflicting rules of substantive law in the labor relations area (or suggest) the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose ... (F)air representation duty suits often require review of the substantive positions taken and policies pursued by a union in its negotiation of a collective bargaining agreement and in its handling of the grievance machinery; as these matters are not normally within the Board's unfair labor practice jurisdiction, it can be doubted whether the Board brings substantially greater expertise to bear on these problems than do the courts which have been engaged in this type of review since the Steele decision." Vaca, 386 U.S. at 180-81, 87 S.Ct. at 911-12.
 
 
 [11]
 The Mitchell Court stated:
 '(T)he grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government.... The processing machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.' United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 1350-51, 4 L.Ed.2d 1409 (1960). Although the present case involves a fairly mundane and discrete wrongful discharge complaint, the grievance and arbitration procedure often processes disputes involving interpretation of critical terms in the collective bargaining agreement affecting the entire relationship between the company and union. See, e. g., Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (seniority rights of all employees). This system, with its heavy emphasis on grievance, arbitration, and the "law of the shop," could easily become unworkable if a decision which has given "meaning and content" to the terms of an agreement, and even affected subsequent modifications of the agreement, could suddenly be called into question as much as six years later.
 --- U.S. at ----, 101 S.Ct. at 1564. The Mitchell Court held that New York's 90-day limitation period for bringing an action to vacate an arbitration award was applicable to an employee's § 301 and breach of duty suit which would have had the effect, if successful, of reopening an otherwise binding arbitration decision. Where such a short limitation period is applicable, the employer's finality interest will be less weighty. It is possible, however, that much longer limitation periods will govern § 301 and breach of duty suits that do not challenge the correctness of an arbitration award (e. g., where the union has failed to pursue a grievance to arbitration). And, of course, the employer also has a reasonable expectation that his commitment of time and resources to the processing of grievances in accordance with the provisions of the contract will not be routinely frustrated by the union's improper processing or presentation of employees' grievances.
 
 
 [12]
 The Huffman Court stated:
 A major responsibility of negotiators is to weigh the relative advantages and disadvantages of differing proposals.... The bargaining representative ... is responsible to, and owes complete loyalty to, the interests of all whom it represents.... Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.
 345 U.S. at 338, 73 S.Ct. at 686.