**KRISPY KREME DOUGHNUT CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Bakery, Confectionery and Tobacco Workers International Union, Local 213, AFL–CIO/CLC, Intervenor.**

**Nos. 82–1772, 82–1773 and 82–1967.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 15, 1983.

Decided April 27, 1984.

H. Lane Dennard, Jr., argued, John W. Hoag, III, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, S.C., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Judith Dowd, argued, N.L.R.B., Washington, D.C., for respondent.

Irwin H. Cutler, Jr., argued, Laurel Fuson, Segal, Isenberg, Sales & Stewart, Louisville, Ky., for intervenor—Bakery, Confectionery and Tobacco Workers Intern. Union, Local 213, AFL–CIO/CLC.

Before KENNEDY and WELLFORD, Circuit Judges, and WEICK, Senior Circuit Judge.

WELLFORD, Circuit Judge.

Petitioner, Krispy Kreme Doughnut Corporation ("Krispy Kreme"), requests this Court to review and set aside the order of the National Labor Relations Board ("Board"), respondent, requiring it to bargain with the union, Bakery, Confectionery and Tobacco Workers International Union, Local 213, AFL–CIO–CLC ("Intervenor").

During May of 1980, an election was held at Krispy Kreme's Louisville, Kentucky facilities resulting in 20 votes in favor of the union, 14 against representation by the union, and 4 challenged ballots. On May 30, 1980, Krispy Kreme filed an objection alleging that the union's conduct violated Section 8(b)(1)(A) of the National Labor Relations Act ("N.L.R.A."). The employer's objection and the unfair labor practice charge were consolidated for hearing before the Administrative Law Judge ("ALJ"), who overruled the election objections and dismissed the unfair labor practice complaint. The Board, on May 7, 1982, affirmed the decision of the ALJ[1] and adopted his recommendation. The union was designated by the Board as the collective bargaining representative for the Krispy Kreme employees. When Krispy Kreme refused to bargain, the Board ordered it to do so on September 30, 1982; this appeal followed.

The principal dispute in this case arises out of the actions of Robert Foote, the primary union advocate at the Krispy Kreme facilities. The employer contended that Foote, acting on behalf of the union, which was seeking to organize the Krispy Kreme employees, made offers to a number of employees that, if they signed a union authorization card prior to the election, they could avoid paying an initiation fee to the union. Acting on the employer's complaints, the General Counsel, after taking affidavits from various employees, initiated proceedings before the Board. At the hearing before the ALJ, five witnesses testified that Foote stated that employees who signed cards would have initiation fees waived, but those who did not sign would have to pay such fees. Foote denied making statements attributed to him by a number of Krispy Kreme employees, and the ALJ discounted or discredited virtually all this contrary testimony to reach his decision. Foote's alleged conduct, if acting as the union's agent, is of the kind proscribed in *N.L.R.B. v. Savair Mfg. Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973). *Savair* held that union offers to waive initiation fees as to only those employees who signed authorization cards before an election was an unfair labor practice because it interferes with employees' fair and free choice. The first question is whether the ALJ's finding that Foote did not make the statements is unreasonable. *Local Union No. 948, IBEW v. N.L.R.B.*, 697 F.2d 113 (6th Cir.1982). The second question is whether Foote was acting as a union agent when he made the statements.

The union's policy with respect to initiation fees was that they were waived for all employees who were employed before the union obtained a contract. The policy is not challenged by Krispy Kreme to be in violation of the NLRA or *Savair*. The real question in this case is whether Foote followed union policy or whether employees were misinformed because of statements by Foote that waiver of initiation fees applied only to those signing authorization cards. There is no suggestion that Krispy Kreme said anything about waiver, although Krispy Kreme's representatives in meetings with employees had stated that the union would be charging an initiation fee anywhere from $75 to $150.

The standard of review for the Board's factual determinations is whether:

> [U]pon the active record they are supported by substantial evidence. Evi-

---

**1.** The Board did set aside the ALJ credibility finding that an adverse inference arose against petitioner because of its failure to call a corroborating witness, a former employee of the Company (Napper).

dence is substantial if it is adequate, in a reasonable mind, to uphold the decision. Application of this standard requires the Court to consider the body of evidence which opposes the Board's decision, but prohibits the Court from conducting a *de novo* review of the record.

*Union Carbide Corp. v. N.L.R.B.*, 714 F.2d 657, 660 (6th Cir.1983) (citations omitted).

It is normally the function of the Board to resolve factual controversy and credibility questions. *N.L.R.B. v. I.U.O.E., Local 18*, 500 F.2d 48 (6th Cir.1974). "The Board's choice between conflicting testimony will not be set aside simply because [the] court 'would justifiably have made a different choice had the matter been before it *de novo*.'" *Local Union No. 948, IBEW v. N.L.R.B.*, 697 F.2d 113, 117 (6th Cir.1982) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1950)).

■ We find, however, in the unusual factual setting, in which the ALJ credited Foote while discrediting a number of other witnesses whose version of what occurred during their several conversations was completely opposite, we must carefully examine the credibility determinations. A reviewing court does not act, even in credibility matters, as a mere rubber stamp for the administrative agency action on appeal. *Cross Co. v. N.L.R.B.*, 286 F.2d 799 (6th Cir.1961); *Medline Ind., Inc. v. N.L.R.B.*, 593 F.2d 788, 795 (7th Cir.1979); *Edgewood Nursing Center v. N.L.R.B.*, 581 F.2d 363, 365 (3d Cir.1978). As noted in *Portable Electric Tools, Inc. v. N.L.R.B.*, 309 F.2d 423, 426 (7th Cir.1962) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)):

> If this Court ... is not to be "merely the judicial echo of the Board's conclusion" then its determination must "be set aside when the record ... clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both .... The substantiality of evidence must take into account whatev-

er in the record fairly detracts from its weight."

■ There are a number of reasons why Foote's credibility should be questioned. Foote was acknowledged by the union to be assisting it in its organizing campaign at Krispy Kreme. He distributed most of the authorization cards signed by fellow Krispy Kreme employees, and he was instructed by a union agent to discuss initiation fees with the employees. Foote expected to become union shop steward after the union won the election. Foote also acted as a union observer at the election. Thus, Foote was clearly an interested witness.

In examining Foote's testimony, and his denial that he offered a number of employees a waiver of initiation fees if they signed union authorization cards, the ALJ conceded that Foote's oral evidence at the hearing differed from his version of events given in the affidavit which he had given to the General Counsel only a short time after the events occurred. The ALJ conceded that Foote had been involved in misstatements in his affidavit concerning his confrontation with a fellow employee, Ladd, about the latter's pension rights. The ALJ concluded that this "has some effect on Foote's overall credibility," but it "was not determinative in deciding the Ladd pension issue." (Jt.App. at 25). More than this, Foote's testimony at the hearing differed from his earlier affidavit concerning the initiation fee waiver:

> It's hard to remember. I may have discussed it [the Union's waiver policy] when I gave them cards, especially when they asked about it. If they asked me about it when I passed them out I certainly did tell them about it. About two at most asked me.

(Jt.App. at 31).

At the hearing Foote testified that he had told employees that the initiation fee would be $125 if the union did not waive it but that it would be waived for everybody. He denied that he told anyone about the fees when he gave out the cards. Foote admitted that his swearing to the truth of his affidavit was a false statement; that

his mind then "was a total blank" and he "was tired [and] ... didn't feel like talking at the time." (Jt.App. at 25; Exh. at 592). He was also inconsistent about the number of authorization cards he had picked up from the union agent,[2] about whether he had discussed his testimony with his attorney before the hearing, and about who had advised him about the union's waiver policy concerning initiation fees. He conceded that his false affidavit information about Ladd was due to his not wanting to admit what he had told Ladd to the NLRB investigator. In sum, Foote asked the ALJ to believe, and apparently persuaded him to accept his explanation, that he had a better recollection of events about ten months after the events took place than he did in giving an affidavit[3] only a few weeks after the occurrences. The admitted misstatements and the numerous inconsistencies in Foote's testimony, as compared to what he related in his affidavit, cannot be set aside lightly in our view, particularly when Foote had to be aware at the hearing about the serious impact of any admission that he had been guilty of *Savair*-type infringements and the effect of his statements regarding the Ladd pension issue. Foote's testimony at the hearing above outlined was not only inconsistent with his affidavit, it was also inconsistent, as will be seen, with that of a number of employees called by the General Counsel and by the union.

This Court has, in an opinion authored by Judge Weick rejecting an ALJ's credibility determination, commented upon crediting one aspect of a prejudicial witness testimony while discrediting other portions of that same witness' testimony. *N.L.R.B. v. Mt. Vernon Telephone Corp.*, 352 F.2d 977 (6th Cir.1975). The ALJ in this case has credited that part of Foote's testimony about the initiation fee waiver while finding that he was not truthful in other respects. And it has done so even though that required discrediting each of the contradictory versions in the testimony of other employees.

In accepting Foote's testimony, the ALJ rejected the testimony of five employees, each of whom testified that Foote had stated that initiation fees would be waived only for those who signed cards. Each of these witnesses, who were called by the General Counsel, had given statements to the General Counsel to the same effect shortly after the election. There was no evidence that the employer attempted to influence any of these witnesses.

The testimony of these witnesses that Foote had told them they must sign authorization cards in order to have the initiation fee waived is also corroborated by circumstantial evidence. Employee witness, Mary Nelson, called by the union, testified that some employees, naming Tina Parris and Ruby Blakely, thought they would have to pay an initiation fee if they did not sign cards. (Exh. at 504). Brenda Meyer testified that there was teasing among the employees about having to pay the initiation fee if an employee did not sign a card. Unless there was a belief on the part of employees that they would have to pay if they did not sign, there would be no basis for teasing them about it. Meyer testified that it could have been Foote who made the teasing statement about having to pay initiation fees.

In addition, we note that the ALJ seemed to credit Sada Moore's testimony to the effect that Foote had not discussed with her the waiver of initiation fees. The ALJ, however, did not specifically discredit Moore's testimony to the effect that Foote called her on the phone to discuss the union, and asked if she could find out for him if anyone on her shift had received cards. Moore testified that she had refused this invitation, but that Foote had asked her:

[I]f we passed out so many cards, and the ones that didn't sign them, if it would

---

**2.** This inconsistency could well have been construed as an attempt to discount his role as a union organizing assistant before the election.

**3.** The affidavit was approximately seven pages in length.

be all right, if maybe, the names were signed to the cards.

(Exh. at 695).

Moore responded, according to her testimony, that forging of names to cards would not be legal. (Exh. at 696). Moore further testified that employees of Krispy Kreme did discuss the initiation fee question in the lunchroom and that some thought they would have to pay a fee if they did *not* sign a card. The ALJ merely pointed out that Foote denied on surrebuttal that he had discussed forging employees' names to authorization cards with Moore. (Jt.App. at 18, n. 36).

The ALJ did refuse to accept, or rely on, the testimony of General Counsel witnesses, Parris, Vermillion, Logsdon and Lewis, because he found their testimony "was intentionally meant to favor Krispy Kreme at the expense of the truth." There is no basis in the record for this assertion. These employees may not have wished to have a union, but there is no evidence that they had any particular affection for their employer or had received any special treatment from it. Parris had signed a card for the union. The reasons for discrediting the witnesses who testified that Foote had conditioned waiver of the fee on signing the cards do not withstand scrutiny. The ALJ found Parris not credible at least in part because her recollection about what took place at a union organizational meeting with Krispy Kreme employees differed from what union agent Simpson had said about the number of people required to sign authorization cards and the effect on an election. The ALJ noted, "The other witnesses called by General Counsel *could*

*not remember* Simpson making such a statement. Others present testified that no such statement was made." (Jt.App. at 27) (emphasis added). The ALJ described Parris as "an aggressive, ambitious individual who would not hesitate to, and did in fact, place self-interest above the truth." (*Id.*) The ALJ did not allude to why it was in Parris' self-interest not to tell the truth, except to indicate she was one of the employees who voluntarily signed a card and, according to the ALJ, "needed no real inducement to sign ...." [4] (*Id.*)

Vermillion, like Parris, testified that Foote offered the inducement of waiving initiation fees if she signed the union authorization card. The ALJ described Vermillion's testimony as rambling; that she was nervous and frightened while testifying; and that she was either fabricating or "attempting to recall the content of her affidavit." (Jt.App. at 28). The ALJ dismissed her testimony because she was so frightened that "she would be less than truthful, although reluctantly, to insure that she kept [her job]." [5] (Jt.App. at 31). The ALJ similarly characterized Logsdon and Lewis, who testified that Foote made a similar inducement to them, as "frightened" about losing their jobs.

Another employee, Akemon, testified that union agent Simpson said in her presence, and that of Parris, Foote, and others, that those who had not signed authorization cards would have to pay an initiation fee. The ALJ characterized Akemon as "confused in her recollection .... [N]ot reliable." [6] (Jt.App. at 29–30). At the same time, the ALJ conceded that most

---

**4.** Parris testified that she approached Foote because she heard that he "was trying to get the employees together to organize a union." (Exh. at 194–95). Napper, a witness called by the union, testified that Parris did believe that only those who signed a card prior to the election could avoid an initiation fee. (Exh. at 504).

**5.** Despite her purported fears, Vermillion testified, without contradiction, that she told Foote that she wouldn't work on a picket line but, instead, would "go get me another job." (Exh. at 254). The ALJ noted that Vermillion indi-

cated she had once "started a union herself." (Jt.App. at 28, n. 62).

**6.** Akemon also testified that Foote spoke of the issue of initiation fees at this first meeting, but this testimony was "not relied on" by the ALJ. (Jt.App. at 30). Parris' testimony confirmed Akemon's about the remarks of Simpson. The ALJ found Akemon's testimony "unreliable" because her testimony differed from others about what was said at the first union-employees meeting, but the ALJ conceded all the testimony differed about the details of this meeting.

accounts differed about what Simpson had said at the employee meeting about initiation fees and other details of the meeting; Simpson himself "was not sure" about what he had said. (Jt.App. at 30).

Even if Lewis were discredited by the ALJ in regard to his version of a number of conversations with Foote, he also testified that a pro-union employee, Nelson, had told him about initiation fee waiver for those who signed the cards. (Exh. at 360). Employee Price also testified that *Foote and Nelson*[7] told employees that "if 'you don't sign a union card, then if the union came in, you'd have to pay an initiation fee in order to get into the union.'" (Jt.App. at 18). As pointed out, Moore also testified that employees were confused about paying an initiation fee. The ALJ acknowledged, in this regard:

> Meyer and Lees also testified about this confusion with the former indicating that just after the cards were signed people in the breakroom teased one another that if they didn't vote for the Union they would have to pay an initiation fee, and the latter indicating that there was a lot of talk about initiation fees amongst the employees.

(*Id.*) (footnote omitted).

The ALJ found that Krispy Kreme's manager had told employees that the union was going to charge an initiation fee. He concluded that any employee confusion that existed about whether initiation fees would be waived if an authorization card were signed was therefore created by Krispy Kreme; because it had made initiation fees "an issue" of "what otherwise would have been a non-issue." (Jt.App. at 32). The employer was not the source of the confusion about *waiver* of such fees nor was there any evidence to suggest that it was. Rather it seems clear that even if at least four employees had misunderstood

what Foote (or Simpson) said on behalf of union organizing efforts, Foote was the source of the discussions about waiving initiation fees.

We find the ALJ credibility determination under the unusual facts of this case to be unreasonable. *See Local Union No. 948, IBEW v. N.L.R.B.*, 697 F.2d at 1117. To attribute Foote's version of his discussions about initiation fees and waiver of fees as truthful and to discredit entirely on dubious bases versions of four or five other employees, some of whom supported the union, in the face of Foote's admitted discrepancies in other material respects, is simply contrary to good sense. *See N.L. R.B. v. Paschall Truck Lines*, 469 F.2d 74, 76 (6th Cir.1972); *N.L.R.B. v. Universal Packaging Corp.*, 361 F.2d 384, 388 (1st Cir.1966). We reach this latter decision reluctantly because of the general rule that the Board's credibility determinations are controlling. In this case, however, in addition to what is summarized above, there is also the contested testimony of witness Moore, not discredited by the ALJ, that Foote was so anxious to assist the union in its organizing activities that he suggested forging signatures to authorization cards.

Accordingly, we REVERSE and set aside the contested election; the controversy is REMANDED to the Board for further proceedings consistent with this opinion.

---

**7.** Witness Livengood also indicated that Nelson had made such a statement to him, which Nelson attributed to a union representative at a meeting. (Jt.App. at 21). Livengood, a Krispy Kreme spokesman, realized that this might be grounds for overturning the election. The ALJ found Livengood's testimony "incredible." (Jt. App. at 22).