740 F.2d 141
 116 L.R.R.M. (BNA) 3292, 101 Lab.Cas. P 11,126
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Ted Katsaros, Intervenor,
v.
LOCAL 282, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.
 No. 1262, Docket 84-4027.
 United States Court of Appeals,
Second Circuit.
 Argued May 7, 1984.
Decided July 19, 1984.
 
 Marjorie S. Gofreed, Atty., Washington, D.C. (William A. Lubers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., on the brief), for petitioner.
 Daniel E. Clifton, Hall, Clifton & Schwartz, New York City (Susan M. Jennik, New York City, on the brief), for intervenor.
 J. Kenneth O'Connor, O'Connor & Mangan, P.C., Long Island City, N.Y., for respondent.
 
 
 1
 Before FRIENDLY and WINTER, Circuit Judges, and LASKER, District Judge.*
 
 
 2
 LASKER, District Judge.
 
 
 3
 This petition to enforce an order of the National Labor Relations Board ("NLRB" or "the Board") directed at respondent-appellant Local 282, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, involves the question of whether a union breaches its duty of fair representation when it provides inadequate notice of an arbitration award affecting many of its members. For the reasons set forth below, we conclude that it does and enforce the Board's order in full.
 
 I.
 
 4
 Transit-Mix Concrete Corporation ("Transit-Mix") is a major supplier of ready-mix concrete in the New York metropolitan area and employs drivers to deliver concrete to construction sites throughout the region. On February 13, 1976 the company announced that it had agreed to purchase the assets of Colonial Sand and Stone Co., Inc. ("Colonial"), a competitor. While the record is not entirely clear, it appears that at the time Transit-Mix and Colonial respectively employed 72 and 237 truckdrivers on separate seniority lists. Both companies had individually entered into a collective bargaining agreement with Local 282 which made the union the exclusive bargaining agent for its drivers. Transit-Mix elected to treat its purchase of Colonial's assets as a "buy-out" which meant, according to section 9 of the bargaining agreement, that Colonial's drivers were to be placed at the bottom of the Transit-Mix seniority list.[1]
 
 
 5
 On the evening of February 13, about 200 Colonial drivers attended a meeting held to explain the effect of the buy-out upon them. Jim Geohegan, then president of Local 282, explained to the assembled group that Colonial's drivers were going to be placed at the bottom of the Transit-Mix seniority list and would be called back to work according to their seniority ranking. Edward Halloran and Alvin Chattin, president and vice-president of Transit-Mix, told the meeting that all Colonial drivers not hired immediately would be called back as business conditions warranted, that in the meantime they would be placed on indefinite layoff, that new drivers would not be hired until the expanded seniority list was exhausted, and that the laid-off drivers would not have to "shape-up," or report to a designated place for possible hire, until they received a registered letter in the mail. The latter point was consistent with section 15 of Local 282's agreement with Transit-Mix and Colonial, which provided that employees laid off due to lack of employment need not shape regularly in order to preserve their seniority rights. In response to several questions from the Colonial drivers at the meeting, both Transit-Mix and Local 282 officials repeatedly reassured them that their right to be recalled according to their seniority rankings would remain in effect indefinitely.
 
 
 6
 Transit-Mix also asked the assembled Colonial drivers to report to its Bronx barn for shape-up the following morning to allow it to ascertain the number of drivers who would be offered immediate employment and the number who would be placed on indefinite lay-off. The next day, Transit-Mix offered jobs to drivers listed at number 76 and above on the Colonial seniority list. Over the next three years, from 1976 through 1978, Transit-Mix recalled additional Colonial drivers, contacting those drivers ranked at number 138 and above on the Colonial seniority list. Not all recalled drivers responded to Transit-Mix's recall letters or accepted the company's offer of employment, and others worked for Transit-Mix only on an intermittent basis.
 
 
 7
 Early in 1979, a dispute arose over Transit-Mix's obligation to continue to recall drivers from the Colonial seniority list. Transit-Mix, concerned about the size of its seniority list, took the position that Colonial drivers who had not shaped or contacted the company since 1976 had abandoned their jobs and should be removed from its list. Local 282 disagreed and, pursuant to section 23 of the union's 1978-82 collective bargaining agreement with the company, the issue was submitted to the Joint Labor-Management Disputes Panel, composed of an equal number of labor and management representatives, for resolution. Deadlock ensued and, again pursuant to section 23, the matter was submitted to an impartial arbitrator, Herbert Lippman, to determine: "What is the reasonable length of time within which an employee of the Company must shape up, call or contact the Company to remain part of the Company work force and retain his seniority?"[2] Lippman's arbitration award, dated June 27, 1979, held that "[a]n employee who does not shape up, call or contact [Transit-Mix] for work for a period of one year, shall be deemed to have abandoned his position with the Company and shall no longer be considered an employee of the Company."[3]
 
 
 8
 Robert Sasso, Local 282's secretary-treasurer, testified at a hearing before NLRB Administrative Law Judge D. Barry Morris ("ALJ") that when he learned of the award in July of 1979 he told Louis Ambrosio, the union's master steward, and Albert Martelli, steward for the Bronx, "to get the word out to the men what had transpired as far as the Arbitration Award was concerned."[4] Sasso must have known that the terms of the arbitration award contradicted the representations made to the Colonial drivers at the time of the buy-out because he also testified that he had participated at the February 13, 1976 meeting of the drivers in his capacity as an official of the union.[5] Martelli testified before the ALJ that he followed Sasso's instructions and the next day told those drivers who appeared for morning shape-ups (who did not include about 150 drivers who had not received recall letters and who had not shaped in the three years since the buy-out[6]) that all drivers had to shape at least once per year to maintain their seniority. The union took no further steps to publicize the award or to notify affected drivers who were not present in the Bronx for shape-ups on that day.
 
 
 9
 Ted Katsaros, the intervenor, is a laid-off Colonial driver who held number 152 on the Colonial seniority list. In late 1979 or early 1980, he noticed that Transit-Mix had hired new drivers to work on its trucks on a regular basis. Katsaros then wrote to Transit-Mix to ask about his seniority status and, by letter dated March 13, 1980, was informed by a company official that an arbitration award had been issued. Katsaros eventually learned of the terms of the award in May of 1980 when the union allowed him to examine it in its offices. In June of 1980 he filed with the NLRB an unfair labor practice charge which asserted that the union, in complicity with Transit-Mix, violated the rights of Colonial drivers under section 7 of the National Labor Relations Act ("NLRA"), 29 U.S.C. Sec. 157 (1982) by contriving a fraudulent arbitration proceeding that was intended to deny persons on the Colonial seniority list their seniority rights, and (2) by deceiving Colonial drivers into thinking that their seniority rights were protected and withholding information about the arbitration award for more than six months in order to prevent dissatisfied drivers from seeking an NLRB order reinstating their seniority rights.[7]
 
 
 10
 On March 18, 1981, the NLRB filed its complaint against Local 282 charging that the union had breached its statutory duty of fair representation under section 8(b)(1)(A) of the NLRA, 29 U.S.C. Sec. 158(b)(1)(A) (1982), by failing to inform all affected drivers of the terms of the arbitration award. The ALJ conducted a hearing on this matter in January of 1982 and, in a decision dated March 30, 1982, held that Local 282 had not engaged in any unfair labor practices. Accordingly, he dismissed the complaint.
 
 
 11
 The Board reversed the ALJ in a decision and order dated August 26, 1983. It held that Local 282 had breached its statutory duty of fair representation under section 8(b)(1)(A) of the Act by arbitrarily failing to notify the employees it represented of the terms of the arbitration award which significantly altered their seniority rights. The union was ordered to take a number of remedial measures, among them: (1) to request a reopening of the arbitration to provide for notice to affected employees and a retroactive grace period; (2) to post notice of the award at its offices and meeting halls and publish the award in its monthly newspaper; and (3) to pay damages to employees adversely affected as a result of its conduct. When Local 282 failed to comply with the order, the Board filed this petition for enforcement.
 
 II.
 
 12
 As a threshold issue we must determine whether the NLRB's order can be enforced solely upon the Board's finding that Local 282's conduct amounted to an unfair labor practice proscribed by section 8(b)(1)(A) of the NLRA.[8] The Supreme Court has recognized that a statutory duty of fair representation, requiring a union to represent fairly all employees, applies in situations in which the union is the employees' exclusive bargaining agent. See, e.g., Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). This duty is breached "only when a union's conduct ... is arbitrary, discriminatory, or in bad faith." Id., 386 U.S. at 190, 87 S.Ct. at 916. While the duty was first discussed in cases involving the application of the Railway Labor Act, 45 U.S.C. Secs. 151-188 (1982), to alleged racial discrimination, see, e.g., Steele v. Louisville and Nashville Railroad, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), the Court has also recognized the duty to be implicit in section 9(a) of the NLRA, 29 U.S.C. Sec. 159(a) (1982), which sanctions exclusive representation by unions. See Wallace Corp. v. NLRB, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216 (1944).
 
 
 13
 NLRA section 8(b)(1)(A) makes it an unfair labor practice for a labor organization to restrain or coerce employees in the exercise of rights guaranteed by section 7. 29 U.S.C. Sec. 158(b)(1)(A) (1982). These rights include the right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection", and the right to refrain from such activities. 29 U.S.C. Sec. 157 (1982). In Miranda Fuel Co., 140 N.L.R.B. 181 (1962), enforcement denied, 326 F.2d 172 (2d Cir.1963), the NLRB first held that a breach of the duty of fair representation was an unfair labor practice prohibited by section 8(b)(1)(A) because it unjustifiably restrained section 7 rights. Although we declined to adopt this theory in NLRB v. Miranda Fuel Co., supra, Courts of Appeals of other circuits have subsequently held that such a breach violates section 8(b)(1)(A). See Local Union No. 12, United Rubber, Cork, Linoleum and Plastic Workers v. NLRB, 368 F.2d 12, 17-21 (5th Cir.1966), cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967); see also Newport News Shipbuilding and Drydock Co. v. NLRB, 631 F.2d 263, 269-70 (4th Cir.1980); NLRB v. American Postal Workers Union, 618 F.2d 1249, 1254-55 (8th Cir.1980); Kesner v. NLRB, 532 F.2d 1169, 1173-75 (7th Cir.), cert. denied, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976); Kling v. NLRB, 503 F.2d 1044, 1046 (9th Cir.1975); Truck Drivers and Helpers, Local Union 568 v. NLRB, 379 F.2d 137, 141-42 (D.C.Cir.1967). Moreover, in Vaca v. Sipes, supra, 386 U.S. at 177-78, 87 S.Ct. at 909-910, the Supreme Court assumed that a breach of the duty of fair representation is an unfair labor practice prohibited by section 8(b) of the NLRA.[9]
 
 
 14
 While we have previously recognized the tension between our decision in Miranda Fuel Co. and the other decisions noted above, see NLRB v. Actors, Equity Association, 644 F.2d 939, 941-42 n. 2 (2d Cir.1981); NLRB v. Local 485, International Union of Electrical, Radio and Machine Workers, 454 F.2d 17, 21 n. 6 (2d Cir.1972), the Board is correct when it argues here that a majority of the panel in Miranda Fuel Co. declined to decide whether in fact a breach of the duty of fair representation violates section 8(b)(1)(A). See NLRB v. Miranda Fuel Co., supra, 326 F.2d at 180 (Lumbard, C.C.J., concurring); Id. 18 n.1 (Friendly, C.J., dissenting). Consequently, the issue remains open for our consideration.
 
 
 15
 We have noted that the Supreme Court's opinion in Vaca v. Sipes establishes that under section 8(b)(2) of the NLRA a breach of the duty of fair representation "entitles the aggrieved employee(s) to relief in the courts at law as well as before the National Labor Relations Board", Ryan v. New York Newspaper Printing Pressman's Union No. 2, 590 F.2d 451, 455 (2d Cir.1979), and that a breach can be found in contexts in which a union negotiates and implements collective bargaining agreements. Id. We see no reason why a breach of this duty cannot also be found in the context of this case, in which the union is charged with failing to inform many of its members about an arbitration award affecting their employment status, nor why a breach cannot be actionable under section 8(b)(1)(A) which has wider application than other NLRA provisions. We do not read Vaca v. Sipes as precluding the use of section 8(b)(1)(A) to support a finding of a breach of the duty of fair representation, and we agree with Courts of Appeals that have held that "the language of section 8(b)(1)(A), unlike certain other provisions of section 8, is not restricted to discrimination which encourages or discourages union membership." Kesner v. NLRB, supra, 532 F.2d at 1174; Local Union No. 12, United Rubber, Cork, Linoleum, and Plastic Workers v. NLRB, supra, 368 F.2d at 20. Accordingly, we hold that a union may be found to have engaged in an unfair labor practice by breaching its statutory duty of fair representation within the requirements of section 8(b)(1)(A) of the NLRA.
 
 III.
 
 16
 We turn to the question whether the Board correctly found that Local 282 breached its statutory duty of fair representation. Decisions of the NLRB must be accepted on appeal when supported by substantial evidence on the record as a whole. 29 U.S.C. Sec. 160(e) (1982); see Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Ewing v. NLRB, 732 F.2d 1117, 1120 (2d Cir.1984); NLRB v. Local 3, International Brotherhood of Electrical Workers, 730 F.2d 870, 876 (2d Cir.1984). This standard of review applies even in a case such as this in which the ALJ and Board reached contrary conclusions from the same set of facts. See Universal Camera Corp. v. NLRB, supra, 340 U.S. at 496, 71 S.Ct. at 468. The role of this court is to determine "whether or not there is any substantial evidence supporting the Board's views; if there is, those views must prevail." NLRB v. Donald E. Hernly, Inc., 613 F.2d 457, 462 (2d Cir.1980). See also Alfred M. Lewis, Inc. v. NLRB, 681 F.2d 1154, 1155 (9th Cir.1982); NLRB v. Steinerfilm, Inc., 669 F.2d 845, 849 n. 4 (1st Cir.1982).[10] Our review of the record leads us to conclude that substantial evidence supports the Board's findings that the union was under an obligation effectively to communicate the terms of the arbitration award to all affected employees, that it did not satisfy this obligation by merely making an oral announcement of the award's terms one morning at shape-ups, and that it breached its statutory duty of fair representation.
 
 
 17
 The union takes the somewhat amazing position that it was not obligated to notify all affected employees of the terms of the arbitration award, specifically those drivers who had not shaped in the three years since the buy-out. They base their argument upon that provision of the award which declares that those drivers had "abandoned their positions with the Company and are no longer members of the work force by their own choice."[11]
 
 
 18
 Substantial evidence, however, supports the Board's finding the union to be under an affirmative obligation to notify all laid-off Colonial drivers of the award's terms. The collective bargaining agreement which the union had with both Colonial and Transit-Mix specifically provided that laid-off drivers did not have to shape on a regular basis in order to preserve their seniority rights. Colonial drivers were repeatedly assured by Transit-Mix and Local 282 officials that this provision of the agreement remained in force. In addition, for three years following the buy-out, through the use of registered letters, Transit-Mix lived up to its representations by recalling laid-off Colonial drivers who were told they no longer needed to shape. Had the union provided notice to those drivers who lost their seniority under the award, they could have invoked judicial or arbitral remedies in an effort to invalidate or alter the terms of the arbitration.
 
 
 19
 Substantial evidence also supports the Board's finding that the form of notice which Local 282 used was insufficient and ineffective. The union contends that it provided effective notice because it had always made oral announcements of arbitration awards and because it could depend upon word of mouth for its message to reach affected drivers. We disagree. An oral announcement at one day's morning shape-ups was plainly insufficient to reach those laid-off drivers who were told they did not have to shape in order to preserve their seniority. Moreover, it was arbitrary for Local 282 to rely upon past practices and to assume that notice of the award would reach every affected worker by word of mouth. There was no likelihood that many former Colonial drivers would have been present for shape-ups because they were told they no longer needed to shape. It was therefore incumbent upon the union to assure that its members received notice of the award through the use of registered letters or other means of comparable effectiveness.[12]
 
 
 20
 Finally, we conclude that the Board correctly found that Local 282 breached its fiduciary duty of fair representation through its arbitrary conduct. We agree with other courts which have held that arbitrary conduct amounting to a breach is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, "may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." Robesky v. Qantas Empire Airways, Ltd., 573 F.2d 1082, 1089-90 (9th Cir.1978); Warehouse Union, Local 860, International Brotherhood of Teamsters v. NLRB, 652 F.2d 1022, 1025 (D.C.Cir.1981). See also Minnis v. UAW, 531 F.2d 850, 854 (8th Cir.1975); Harrison v. United Transportation Union, 530 F.2d 558, 561-62 (4th Cir.1975) (per curiam), cert. denied, 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976); Ruzicka v. General Motors Corp., 523 F.2d 306, 310 (6th Cir.1975). In addition, we have noted that the fiduciary duty which a union owes to its members requires it to inform them of their obligations so that they may take whatever steps are necessary to protect their interests in their job. NLRB v. Local 182, International Brotherhood of Teamsters 401 F.2d 509, 510 (2d Cir.1968), cert denied, 394 U.S. 213, 89 S.Ct. 1010, 22 L.Ed. 2d 209 (1969), citing, NLRB v. Hotel, Motel & Club Employees' Union, Local 568, 320 F.2d 254, 258 (3d Cir.1963).
 
 
 21
 In this case, as we have said above, Local 282's failure to provide adequate notice to all affected employees was arbitrary and constituted a breach of its duty of fair representation.[13] Local 282 could not have rationally believed that an oral announcement of the arbitration award's change in shaping requirements would have reached the majority of affected drivers, since they would have had no reason to attend the single morning's shape-ups where the announcement was made. The union's failure to inform its members of their obligations to protect their positions was an act of omission which, in the words of the Court of Appeals for the Ninth Circuit quoted above, was so egregious, so far short of minimum standards of fairness to the employees, and so unrelated to legitimate union interests as to be arbitrary. Robesky v. Qantas Empire Airways, Ltd., supra, 573 F.2d at 1090. As we have noted, the union ignored section 15 of the collective bargaining agreement.[14] It also presented testimony, through Mr. Ambrosio, which contradicted section 15, supported the company's position and directly contributed to the arbitration award. The union's conduct, which was contrary to the agreement and its prior representations to the employees, and was thus a major and unpredictable change in position, heightened its duty to give appropriate notice to the membership. We therefore hold that the NLRB's finding that Local 282 breached its statutory duty of fair representation is supported by substantial evidence in the record as a whole.
 
 
 22
 For the foregoing reasons, we grant enforcement of the NLRB's order in full.
 
 
 
 *
 Hon. Morris E. Lasker, Senior District Court Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 A subsequent arbitration award dated June, 1976 confirmed Transit-Mix's position. However, had it been determined that Colonial had actually merged with Transit-Mix, then section 9 would have required Transit-Mix to "slot" Colonial drivers within the Transit-Mix seniority list according to their seniority
 
 
 [2]
 Joint Appendix at 285. It is questionable whether Local 282 was authorized to submit this question to arbitration in view of the provisions of section 15 of the collective bargaining agreement, discussed above, which places no time limitation on excusing laid-off employees from shaping on a regular basis
 
 
 [3]
 Joint Appendix at 290
 
 
 [4]
 Id. at 212
 
 
 [5]
 Id. at 209-211
 
 
 [6]
 See id. at 232
 
 
 [7]
 See id. at 253
 
 
 [8]
 Section 8(b)(1)(A) provides:
 "It shall be an unfair labor practice for a labor organization or its agents--
 (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein;"
 29 U.S.C. Sec. 158(b)(1)(A) (1982)
 
 
 [9]
 The Vaca Court concluded that state court assertion of jurisdiction over such a breach was not preempted by the NLRB because of the general rule articulated in San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959) to the effect that "[w]hen an activity is arguably subject to Sec. 7 or Sec. 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board...." See Vaca v. Sipes, supra, 386 U.S. at 176-88, 87 S.Ct. at 909-915
 
 
 [10]
 Where the ALJ and Board differ on questions of fact which depend on conclusions as to the credibility of witnesses, which is not the case here, the Board's findings "must be stronger than would be required in cases where the [ALJ's] findings are accepted." Ewing v. NLRB, supra, 732 F.2d at 1120, quoting, NLRB v. Interboro Contractors, Inc., 388 F.2d 495, 499 (2d Cir.1967)
 
 
 [11]
 Joint Appendix at 289
 
 
 [12]
 The union also argues that its form of notice was effective because no driver was removed from the Transit-Mix seniority list due to prospective application of the award. This argument does not apply to the Colonial drivers who had not shaped during the three years since the buy-out and who, the NLRB correctly found, were entitled to receive notification from the union. In addition, even as to that class of drivers to whom the union's point is addressed, namely those who had shaped in the year preceding the date of the award, the lack of demonstrable injury does not prevent us from upholding the NLRB's finding the union to be remiss in its obligations based upon the presence of substantial evidence of potentiality of injury
 
 
 [13]
 The union argues that our opinions in Jackson v. Trans World Airlines, Inc., 457 F.2d 202, 204 (2d Cir.1972) and Simberlund v. Long Island Rail Road Co., 421 F.2d 1219, 1225 (2d Cir.1970) require that evidence of bad faith be produced before a finding of a breach of the statutory duty of fair representation is made, see also Matos v. Aeronaves De Mexico, S.A., 548 F.Supp. 933, 938 (E.D.N.Y.1982); Clark, The Duty of Fair Representation: A Theoretical Structure, 51 Texas L.Rev. 1119, 1137 n. 80 (1973), and that no such evidence exists in this case. We do not agree that a showing of bad faith is a prerequisite for establishing the existence of a breach. While it certainly is a sufficient condition, it is not a necessary one. Jones v. Trans World Airlines, Inc., 495 F.2d 790, 798 (2d Cir.1974)
 
 
 [14]
 See footnote 2