NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL 299, INTERNATIONAL BROTH-
ERHOOD OF TEAMSTERS, CHAUF-
FEURS, WAREHOUSEMEN AND
HELPERS OF AMERICA, Respondent.

No. 84–5910.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 3, 1985.

Decided Jan. 23, 1986.

Rehearing and Rehearing En Banc
Denied March 12, 1986.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., John Elligers, Judith Dowd (argued), for petitioner.

Peter B. Karagozian, James P. Hoffa, Detroit, Mich., Gerry Miller (argued); Kenneth Dau-Schmidt, Goldberg, Previant, Uelmen, Milwaukee, Wis., for respondent.

Before MARTIN and CONTIE, Circuit Judges and PECK, Senior Circuit Judge.

CONTIE, Circuit Judge.

The National Labor Relations Board (NLRB or Board) seeks enforcement of its order requiring Local 299, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union) to reimburse employees for lost wages resulting from their participation in

a union instigated, but unauthorized, work stoppage. The NLRB held that Local 299 breached its statutory duty of fair representation, thereby committing an unfair labor practice in violation of section 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A). For the reasons set forth below, we deny enforcement of the order.

## I.

McLean Trucking Company (McLean), a North Carolina corporation, maintains a motor carrier terminal in Detroit, Michigan. Local 299 was the exclusive bargaining representative for McLean employees during the time in question. The relevant collective bargaining contract was the Teamsters National Master Freight Agreement and local supplements, effective April 1, 1979 through March 31, 1982. This contract prohibited most work stoppages, and it specified that if a work stoppage was not authorized by the Union, McLean could suspend or discharge participating employees, and the employees would not have recourse to grievance procedures.[1] In the event of a work stoppage, the employer was obligated under the contract terms to notify certain union officials of this fact and to inquire as to whether the stoppage was authorized. If there is no response to these inquiries, the work stoppage was deemed to be unauthorized.[2]

In September 1979, Peter Jennings became the terminal manager at McLean's Detroit facility, his primary directive being to improve the facility's profitability. One of Jennings' plans was to eliminate job positions ("bids"), including daytime positions ("day-dock bids"). Jennings discussed this possibility in late 1979 with George Langkil, a Union business agent, and Murray Duncan, a Union steward, but did not implement any changes. However, in March of 1980, Jennings deemed it necessary to eliminate ten job positions and ten employees. Three of the ten positions were day-dock bids. The daytime employees affected would not be fired because of their seniority, but they would have been required to work different shifts.

On March 18, 1980, before these changes were officially adopted or announced, Jennings held a meeting open to all employees. The employees were allowed to voice their concerns over various company policies during this two-hour meeting, although they were not informed of the upcoming changes. Employees who attended the meeting were reimbursed for their time. Jennings obviously was not persuaded by the employees' arguments, however, to deviate from his plan. On March 19th, Jennings posted an announcement that, effective March 24, 1980, ten employees would be laid off and three day-dock bids would be eliminated. New starting times for affected employees were also posted.

On March 24th, the three employees who lost their day-dock bids arrived at McLean at 7:00 a.m. and were accompanied by several Union business representatives, including Langkil and Duncan. Jennings was asked to turn over the employees' time cards so they could punch in for work. Jennings refused, responding that the new working times were posted. Langkil then told Jennings that there was going to be a meeting, but Jennings insisted that there was work to be done and there was no time for a meeting.

However, as employees arrived for work and punched-in, Duncan advised them to go to the breakroom for a meeting. At 8:00 a.m. an automatic alarm signaling the shift to begin went off. Shortly thereafter, Jennings had the dispatcher announce on the public address system that the shift had begun. Jennings entered the breakroom at 8:05 and stated that he expected the workers for that shift to report to work. Jen-

---

1. The employer had the right to suspend an employee for 30 days for participating in an unauthorized work stoppage lasting less than 24 hours, or to discharge an employee if the work stoppage lasted over 24 hours.

2. Whether a work stoppage was authorized or not also determines whether a union can be held liable for an employer's damages resulting from the work stoppage.

nings again informed Langkil, while in the conference room, that there would be no meeting and workers should report to work immediately. Langkil replied that no one would work until the three day-dock workers were placed back on the day shift. When another shift began at 8:30 a.m., these workers were also sent to the breakroom for a "meeting," the shift alarm rang and the dispatcher announced the beginning of the shift.

Later in the morning, pursuant to the collective bargaining contract, Jennings sent two sets of mailgrams to the Union's International President, the Chairman of the Central Conference of Teamsters, the Teamsters Conference Office and Local Union President Bob Lins. These mailgrams stated that a work stoppage was under way, asked whether it was authorized, and specified that it was contrary to the contract and created by Union business agents. Jennings informed Langkil that he had sent the mailgrams and then read the pertinent no-strike provision of the contract to him, including the possibility of suspension or discharge for participating employees. Langkil continued to maintain that the employees were merely holding a meeting and were not participating in a work stoppage. The Union never responded to the mailgrams. Neither Langkil nor Jennings told the employees that the company regarded the "meeting" as an illegal work stoppage or that they could be disciplined for participating in the work stoppage since the Union failed to authorize it.

Local Union President Lins arrived around 3:00 p.m. and met with Jennings; nothing was accomplished. Lins told Jennings that a Union meeting would be held that evening and that, "Nobody will be going back to work until I get back with you tomorrow morning to tell you how the bids are going to be."

At 10:00 p.m. a meeting was held at the Union hall and about 40 employees attend-ed. One of the midnight shift employees asked if he should report to work. Lins responded in the affirmative and also stated, "You can stay out 23 hours and 59 minutes, and they can't do anything to you." Possible discipline was not mentioned at this meeting. The midnight shift reported to work.

McLean subsequently suspended for 30 days the employees who had participated in the work stoppage, a total of 58 people. The Union filed grievances on behalf of these employees alleging that the events on March 24, 1980 did not constitute a work stoppage in violation of the contract, but was merely a meeting.

The National Grievance Committee deadlocked with respect to whether the employees had participated in an unauthorized work stoppage. The grievances were then routed to the Michigan Joint State Arbitration Committee for resolution in October 1980. This Committee held that the activities constituted an unauthorized work stoppage, and that according to the terms of the contract the employees therefore were unable to avail themselves of the grievance procedures.

Gerald LaBond, a McLean employee, subsequently filed charges against the Union in a class action suit,[3] and a complaint was issued by the NLRB. A trial was held before an administrative law judge (ALJ), who held that the Union violated its duty of fair representation by placing the interests of three individuals above the interests of the Union as a whole and by failing to inform the employees about the possibility of discipline.[4] Applying the doctrine adopted by the NLRB in *NLRB v. Miranda Fuel Co.*, 140 NLRB 181 (1962), *enforcement denied*, 326 F.2d 172 (2d Cir.1963), the ALJ concluded that the Union, by violating its duty of fair representation, engaged in an unfair labor practice in violation of section 8(b)(1)(A) of the National

---

**3.** McLean brought a civil suit against the Union as well which was settled out of court.

**4.** The ALJ also noted that it was improper for the Union to use intimidating tactics in dealing with Jennings and to use the employees for leverage against the employer without informing them of possible consequences.

Labor Relations Act, 29 U.S.C. § 158(b)(1)(A).[5] The ALJ ordered that the Union cease and desist from these practices and reimburse each employee for the loss suffered as a result of the disciplinary suspensions, including interest. The Union was also required to post the usual notifications of an NLRB order.

The Union appealed the ALJ's order to the Board. On review by a three-member panel, the Board adopted the ALJ's order but modified the conclusions of law. The Board reasoned that the Union's position that the events on March 24, 1980 was merely a meeting and not a work stoppage was never taken in good faith, and that the Union misled the employees as to the consequences of their actions. The Board also held that the Union's failure to authorize the work stoppage constituted arbitrary conduct, and that the employees "had a right to expect that the union would not encourage them to violate the contract in a way that would expose them to a loss of income or even employment." The Board concluded that the Union's lack of good faith and its arbitrary conduct amounted to a breach of its duty of fair representation in violation of section 8(b)(1)(A). The Board requested enforcement of its order pursuant to section 10(e) of the NLRA, 29 U.S.C. § 160(e).

**5.** In *Miranda Fuel*, the Board reasoned that a violation of the duty of fair representation was an unfair labor practice over which they had jurisdiction. Many circuits have recognized this doctrine, including the Second Circuit. *See, e.g., NLRB v. Local 282, International Brotherhood of Teamsters*, 740 F.2d 141 (2d Cir.1984); *Kesner v. NLRB*, 532 F.2d 1169 (7th Cir.), *cert. denied*, 429 U.S. 983, 97 S.Ct. 499, 50 L.Ed.2d 593 and 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976); *Kling v. NLRB*, 503 F.2d 1044 (9th Cir.1975); *Bell & Howell Co. v. NLRB,* 598 F.2d 136 (D.C.Cir.), *cert. denied*, 442 U.S. 942, 99 S.Ct. 2885, 61 L.Ed.2d 312 (1979); *Local Union No. 12, United Rubber Workers v. NLRB*, 368 F.2d 12 (5th Cir.1966), *cert. denied*, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967). This circuit, like the Supreme Court, has not decided whether to adopt the *Miranda Fuel* doctrine. *See Journeymen Pipe Fitters Local 392 v. NLRB*, 712 F.2d 225 (6th Cir.1983) (per curiam); *NLRB v. International Brotherhood of Electrical Workers, Local 575*, 773 F.2d 746, 750 n. 3 (6th Cir.1985) (per curiam); *DelCostello v. International Brotherhood of*

## II.

The Board's factual findings are conclusive if supported by substantial evidence judged by the record as a whole. 29 U.S.C. § 160(e).[6] *See also NLRB v. Cement Transport, Inc.*, 490 F.2d 1024, 1027 (6th Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974); *Laborers & Hod Carriers Local No. 341 v. NLRB*, 564 F.2d 834, 837 (9th Cir.1977). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Credibility assessments of an ALJ or the Board are generally not altered. *Cement Transport*, 490 F.2d at 1029 n. 5. Deference is also given to the Board's construction of the statute if it is "reasonably defensible." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). *See also Laborers & Hod Carriers*, 564 F.2d at 837; *NLRB v. Local 106, Glass Blowers Ass'n*, 520 F.2d 693, 696 (6th Cir.1975). However, federal courts are not to act as "a mere rubber stamp" for the National Labor Relations Board, *Krispy Kreme Doughnut Corp. v. NLRB*, 732 F.2d 1288, 1290 (6th Cir.1984), and enforcement has been refused where the Board applies the incorrect

*Teamsters*, 462 U.S. 151, 170, 103 S.Ct. 2281, 2293, 76 L.Ed.2d 476 (1983).

**6.** Section 10(e) of the Act reads in pertinent part:

The Board shall have power to petition any court of appeals of the United States ... for the enforcement of such order.... [T]he court shall ... have jurisdiction of the proceeding and of the questions determined therein, and shall have power ... to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.

legal standard or applies a correct standard incorrectly, where the Board's interpretation of the Act is not consistent with the policies set forth by Congress, or where the Board attempts to regulate in an area Congress did not commit to it. *See Ford Motor Co.,* 441 U.S. at 497, 99 S.Ct. at 1849.

In the case at bar, the Board again requests that this court adopt the *Miranda Fuel* doctrine which holds that a violation of the duty of fair representation is an unfair labor practice. *NLRB v. Miranda Fuel Co.,* 140 NLRB 181 (1962), *enforcement denied,* 326 F.2d 172 (2d Cir.1963). Before we can reach the merits of this doctrine, however, we must determine whether the Union's actions in fact violated the duty of fair representation. If we determine that the Union's actions do not constitute a violation of this statutory duty, it will be unnecessary to reach the merits of the *Miranda Fuel* doctrine.

A union's duty to fairly represent its members was first recognized by the Supreme Court in *Steele v. Louisville & Nashville Railroad Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). *Steele,* which was brought under the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.,* held that a union, as the statutory exclusive bargaining representative, had the obligation to represent *all* employees impartially and in good faith:

> [W]e think that Congress ... did not intend to confer plenary power upon the union to sacrifice, for the benefit of its members, rights of the minority of the craft, without imposing on it any duty to protect the minority.

323 U.S. at 199, 65 S.Ct. at 230. Therefore, the union could not discriminate against employees on the basis of race in the collective bargaining process. *See also Brotherhood of Railroad Trainmen v. Howard,* 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952). This duty, requiring exclusive bargaining representatives to wield their power in a nondiscriminatory manner, was subsequently read into section 9 of the National Labor Relations Act, 29 U.S.C. § 159.[7] *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); *Syres v. Oil Workers Local 23,* 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1955).

The duty of fair representation has primarily been associated with contract negotiation[8] and the enforcement of that contract through grievance processing.[9] In *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), a case alleging that the union had arbitrarily refused to process a grievance, the Court stated:

> Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

*Id.* at 177, 87 S.Ct. at 909. This circuit has held that *Vaca v. Sipes* set forth a three-prong test that a union must meet in order to fulfill its statutory duty to fairly represent its members:

> A union must conform its behavior to each of these three separate standards. First, it must treat all factions and segments of its membership without hostility or discrimination. Next, the broad

---

7. Section 9(a) provides that unions elected by the majority of employees "shall be the *exclusive representatives* of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment ..." (emphasis added).

8. *E.g., Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048; *Brotherhood of Trainmen v. Howard,* 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283.

9. *See, e.g., Ruzicka v. General Motors Corp.,* 523 F.2d 306 (6th Cir.1975), *cert. denied,* 464 U.S. 982, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983); *Kesner v. NLRB,* 532 F.2d 1169 (7th Cir.), *cert. denied,* 429 U.S. 983, 97 S.Ct. 499, 50 L.Ed.2d 593 (1976); *Griffin v. International Union, UAW,* 469 F.2d 181 (4th Cir.1972); *Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888 (4th Cir. 1980); *De Arroyo v. Sindicato de Trabajadores Packinghouse,* 425 F.2d 281 (1st Cir.), *cert. denied,* 400 U.S. 877, 91 S.Ct. 121, 27 L.Ed.2d 115 (1970).

discretion of the union in asserting the rights of its individual members must be exercised in complete good faith and honesty. Finally, the union must avoid arbitrary conduct. Each of these requirements represents a distinct and separate obligation, the breach of which may constitute the basis for civil action.

*Ruzicka v. General Motors Corp.*, 523 F.2d 306, 309–10 (6th Cir.1975), *cert. denied*, 464 U.S. 982, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983) (citing *Griffin v. International Union, UAW*, 469 F.2d 181, 183 (4th Cir.1974)).

The Board apparently argues that this statutory duty prohibits *any* bad faith or arbitrary action taken by a union. It further asserts that the duty of fair representation imposes an affirmative obligation on a union to inform its members of possible disciplinary consequences for participating in at least some forms of union activity. After careful review of the case law, we believe that there is no support for interpreting the duty of fair representation to encompass the fact situation before us.

█ The Board's position would require this court to take the *Vaca v. Sipes* test completely out of context. *Vaca v. Sipes*, and the Sixth Circuit case *Ruzicka*, involved a union's arbitrary handling of an individual's grievance. Therefore, the union in its unique role as exclusive representative was essentially singling out an individual for different treatment. Even though the complainants in those cases may not have been discriminated against in the classic sense, or even if the union had not acted in bad faith, they were still alleging disparate treatment from other union members—the inability to avail themselves of the grievance procedures.[10] This position would require us to extend the duty to cover a situation involving a work stoppage rather than collective bargaining or grievance processing, and where a member or group was not singled out for different treatment. In other words, the duty would be expanded to include an undefined fiduciary duty which a union owes to its unit as a whole. Such a duty could impose on a union an obligation to authorize a strike, or any number of other affirmative actions. We decline to extend the duty so far, since we believe the duty of fair representation was never intended to be a "catch all" for undesirable union activity. Rather,

[t]he duty of fair representation exists because it is the policy of the National Labor Relations Act to allow a single labor organization to represent collectively the interests of all employees within a unit, thereby depriving individuals in the unit of the ability to bargain individually or to select a minority union as their representative. In such a system, if individual employees are not to be deprived of all effective means of protecting their own interests, it must be the duty of the representative organization "to serve the interests of all members without hostility or discrimination toward any...."

*DelCostello*, 462 U.S. at 164 n. 14, 103 S.Ct. at 2290 n. 14 (quoting *Vaca v. Sipes*, 386 U.S. at 177, 87 S.Ct. at 909).

█ We conclude, as a matter of law, that the duty of fair representation is implicated only when an individual or group is treated differently by a union—either

---

**10.** This element of receiving different benefits than others is found in duty of fair representation cases that do not involve the processing of grievances, or which allege a duty to inform. *See, e.g., Robesky v. Qantas Empire Airways, Ltd.*, 573 F.2d 1082 (9th Cir.1978) (intentional failure to inform an individual that her grievance would not go to arbitration if she rejected the settlement offer violated duty); *NLRB v. American Postal Workers Union*, 618 F.2d 1249 (8th Cir.1980) (arbitrary revocation of assent for individual to temporarily change shifts violated duty); *NLRB v. Local 282, International Brotherhood of Teamsters*, 740 F.2d 141 (2d Cir.1984) (failure to inform some employees about arbitration award terms while informing others violated duty); *NLRB v. Hotel Employees' Union, Local 568*, 320 F.2d 254 (3d Cir.1963) (must inform members of obligation to pay dues, or cannot discharge for failure to pay without violating duty to fairly represent); *Kling v. NLRB*, 503 F.2d 1044 (9th Cir.1975) (to strip individual of seniority rights was an arbitrary constructive discharge violating union's duty to fairly represent); *Retana v. Apartment Operators Union*, 453 F.2d 1018 (9th Cir.1972) (failure to provide Spanish speaking employees with translation of contract might violate duty).

through discriminatory, bad faith, or arbitrary conduct—than another individual, group or the collective. Since such differential treatment was not alleged in this case, we find that the Board was incorrect as a matter of law to find a violation of the duty of fair representation. We therefore decline to consider the *Miranda Fuel* question, and cannot grant enforcement on this basis.

### III.

Since we hold that the Union's actions do not constitute a breach of its duty to fairly represent employees, we must determine whether the Union's conduct violates section 8(b)(1)(A) without the aid of the *Miranda Fuel* doctrine. We note that the issue is not whether the work stoppage itself constituted an unfair labor practice, but whether the Union's interactions with the employees did.

Section 8(b)(1)(A) of the NLRA states in pertinent part:

It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 of this title. . . .

Section 7, in paraphrase, provides that an employee has the right to bargain collectively and to participate in concerted activities, as well as the parallel right to refrain from such activities. To support the Board's holding, therefore, the Union's act of maintaining that a meeting, rather than a work stoppage, was taking place, coupled with its failure to authorize the strike or to inform employees that they could be disciplined for participating in the stoppage, must be considered a restraint or coercion of the members' right to refrain from participating in the work stoppage.

The legislative history of section 8(b)(1)(A) indicates that the original concern was the use of threats and false promises during organizational campaigns, *see NLRB v. Allis-Chalmers Manufacturing Co.*, 388 U.S. 175, 186–202, 87 S.Ct. 2001, 2009–18, 18 L.Ed.2d 1123 (1967); *NLRB v. Drivers Local Union No. 639, Interna-*

*tional Brotherhood of Teamsters*, 362 U.S. 274, 285, 80 S.Ct. 706, 712, 4 L.Ed.2d 710 (1960), "the central theme of which was . . . the elimination of the use of repressive tactics bordering on violence or involving particularized threats of economic reprisals." *Drivers Local Union No. 639*, 362 U.S. at 287, 80 S.Ct. at 714. Section 8(b)(1)(A) "is a grant of power to the Board limited to authority to proceed against union tactics involving violence, intimidation, and reprisal or threats thereof . . .," *id.* at 290, 80 S.Ct. at 715, and does not encompass the "use by unions of methods of peaceful persuasion." *Id.* at 287, 80 S.Ct. at 714. In the case at bar, although the Union did use intimidation tactics with the employer, it did not use violence, intimidation or threats with respect to the employees. Rather, it told incoming workers that a meeting was taking place. There is little, if any, support to suggest that the employees believed they were merely participating in a meeting. Rather, the ALJ found that:

While some employees may initially have believed that they were going to participate in a meeting similar to the one conducted on March 18, they were disabuse [sic] of this mistaken impression when Jennings did not engage in an exchange with them but rather asked them to work, when at least some of them were advised by a union representative that they were not working because they were "protest[ing] the elimination of the day-dock worker shift," when some of them either played or saw their fellow employees playing cards on company time, when some of them laughed at Jennings when he asked them to go to work, and when they left the terminal without permission on company time and attended a meeting at the union hall. . . . [M]ost, if not all, of the employees realized or should have realized that they were engaged in a work stoppage

. . . .

ALJ's opinion at 11. The Board also stated that the activities clearly constituted a work stoppage, which would have been rec-

ognized by anyone familiar with labor relations.

■ Although the employees were not specifically told that the work stoppage was unauthorized, they likewise were not told that it was authorized. Moreover, the work stoppage in question was not only unauthorized, it was illegal. Since it is well settled that a union cannot punish its members for failing to participate in an unlawful work stoppage, *Verville v. International Ass'n of Machinists,* 520 F.2d 615 (6th Cir.1975), the Union's inability to impose such punishment weighs against a finding of coercion. Therefore, since the Union did not threaten or intimidate members to secure participation in the work stoppage, the members knew or should have known that a work stoppage was in progress, and employees were free to not participate in the action instigated by the Union, we hold that the Union did not use restraint or coercion as contemplated by section 8(b)(1)(A).

Enforcement of the Board's order is, accordingly, DENIED.